**Bruce PRESIDENT, Plaintiff,**

v.

**ILLINOIS BELL TELEPHONE COMPANY, et al., Defendants.**

**No. 92 C 6314.**

United States District Court, N.D. Illinois, Eastern Division.

Sept. 20, 1994.

---

Vickie Pasley, Chicago, IL, for plaintiff.

Benjamin Cohen, Chicago, IL, for Ill. Bell Telephone Co.

Robert Fitzgerald, Jr., Chicago, IL, for Local 165.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Bruce President ("President") has sued Illinois Bell Telephone Company ("Illinois Bell") and Local 165 International Brotherhood of Electrical Workers, AFL–CIO ("Union"), charging that both discriminated against him because of his race and "handicap" in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2(a)(1) and (2),[1] and in violation of Illinois state law as well. President also asserts that Union is liable for having "aided and abetted" Illinois Bell in its discriminatory treatment.

Both Illinois Bell and Union have moved for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, each motion

---

1. Further references to Title VII provisions will take the form "Section —," using the numbering in United States Code's Title 42 rather than Title VII's internal numbering.

is granted in its entirety and this action is dismissed with prejudice.

## Summary Judgment Standards

Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to non-movant President (*Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991) and cases cited there). While "this general standard is applied with added rigor in employment discrimination cases, where intent is inevitably the central issue" (*McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 370–71 (7th Cir.1992)), that does not negate the potential for summary judgment in cases where a movant plainly satisfies the Rule 56 standards (*Washington v. Lake County*, 969 F.2d 250, 254 (7th Cir. 1992)). In those terms summary judgment for Illinois Bell and Union is appropriate if the record reveals that no reasonable jury could conclude that President was treated in a statutorily prohibited discriminatory fashion (*Kirk v. Federal Property Mgmt. Corp.*, 22 F.3d 135, 138 (7th Cir.1994)).

## President's Claims

■ President's Complaint charges both Illinois Bell and Union with race *and* "handicap" discrimination in violation of Title VII. But the latter is plainly not actionable under Title VII—as *Jamil v. Secretary, Dep't of Defense*, 910 F.2d 1203, 1207 (4th Cir.1990) says:

Title VII is not a general "bad acts" statute; it only addresses discrimination on the basis of race, sex, religion, and national origin....

■ Illinois Bell's Mem. 11 asserts an entitlement to summary judgment on President's "handicap" discrimination claim because:

nowhere does [President] allege a violation of any federal statute or that Illinois Bell is a federal contractor or subcontractor

under the Rehabilitation Act[, 29 U.S.C. §§ 791–795].

It is true that the Rehabilitation Act's contractual obligations are imposed only on federal contractors or subcontractors (29 U.S.C. § 793(a)) and that President has offered no evidence that Illinois Bell is either. More to the point, as *D'Amato v. Wisconsin Gas Co.*, 760 F.2d 1474, 1484 (7th Cir.1985) confirms:

Congress intended that the administrative scheme be the sole avenue of redress for the handicapped.

That means that someone in President's position can assert a claim under that statute only indirectly by seeking judicial review of the determination of the relevant federal agency (see, e.g., *Andrews v. Consolidated Rail Corp.*, 831 F.2d 678, 684–87 (7th Cir. 1987)), something that he has not done here.

■ But in the federal practice "the complaint need not identify a legal theory, and specifying an incorrect theory is not fatal" (*Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir.1992)). Although by rights the burden of such identification ought to rest on the litigant's counsel, it is enough if the court can ascertain the law that allows judicial cognizance of the asserted claim (*Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1134–35 (7th Cir.1992)).

■ In that respect this Court has also considered (as President's lawyer has not) the potential applicability of the Americans with Disabilities Act ("ADA"), 42 U.S.C.A. §§ 12101–12117. But the short answer there is that President's "handicap" claims are based upon events that occurred no later than 1987, while the provisions of ADA (enacted July 26, 1990) did not become effective until 24 months later (Pub.L. No. 101–336, Title 1, § 108). And there is no basis for applying ADA retroactively (see *Landgraf v. USI Film Prods.*, —— U.S. ——, ——, 114 S.Ct. 1483, 1505, 128 L.Ed.2d 229 (1994)).

That means that President's "handicap" claim is dispatched as a matter of law. This opinion will therefore devote itself exclusively to his claims of race discrimination. Because

those claims and their relevant facts[2] are distinct for the most part as between the two defendants, each defendant's Rule 56 motion will be assessed separately.

### Claims Against Illinois Bell

#### Facts

On June 4, 1979 President, a black male, was hired by Illinois Bell as a repair technician (P–I. 12(n) ¶ 43). On December 24, 1983 (after President's job title had been changed to systems technician) he ruptured a disc in his neck (P–I. 12(n) ¶¶ 43–44, President Aff. ¶ 3). Because of that injury President was unable to perform some of the more physically demanding duties of his job—such as climbing poles and carrying and lifting objects such as ladders—and he was placed under medical restrictions and assigned to light duty (I. 12(m) ¶ 5; Dep. 26–27, 61–62; Dep. Ex. at 1).

Because of the continuing effects of his injury,[3] some time in December 1986 President was transferred to the drafting department as a senior drafter, a job for which he had no prior training or experience (I. 12(m) ¶ 5; Dep. 65, 176). It was originally expected that the transfer would be temporary and that President would resume his duties as a systems technician once released to do so by his and Illinois Bell's doctors (Dep. 61, 111–12). At some point President was permanently assigned to the position of a drafter, but he was later able to get his job title of systems technician reinstated (*id.* 118–20). Throughout President's tenure in the drafting department he was never able to meet the more physically demanding requirements of the systems technician job, and he never actually resumed the duties of that job (*id.* 27, 61–62, 119–20, 170–72).

In the drafting department President's immediate supervisor was Shirley Smith ("Smith"), who in turn reported to Herman Page, Jr. ("Page") (Page Aff. ¶¶ 2–3).[4] Smith supervised thirteen drafters (including President): seven blacks, five whites and one "Indian" (Page Aff. ¶ 4).

President did not fare well as a drafter. What follows is a summary of the disciplinary and other difficulties that he encountered while working in that capacity.

■ On March 10 and 19 and September 10, 1987 President was suspended,[5] the first

2. This District Court has instituted its own General Rule ("GR") 12 to facilitate the resolution of Rule 56 motions:

(a) GR 12(m) requires every Rule 56 movant to submit a statement of assertedly uncontested facts, with citations to the record in support of each of those facts.

(b) GR 12(n) requires the nonmovant to respond point by point, with citations to the record in support of (1) any claimed contest of the movant's version of the facts and (2) any additional facts that the nonmovant chooses to assert.

Illinois Bell's GR 12(m) statement will be cited "I. 12(m) ¶ —," and Union's will be cited "U. 12(m) ¶ —." President's GR 12(n) responses will be respectively cited "P–I. 12(n) ¶ —" and "P–U. 12(n) ¶ —" (President's statement of additional facts is simply numbered sequentially after the responses to defendants' statements). Where President's GR 12(n) statement either explicitly or implicitly admits an assertion in either defendant's GR 12(m) statement, only the latter will be cited. Finally, this opinion refers from time to time to the exhibits attached to President's deposition (which is itself cited simply "Dep. —"). Although the pages of that deposition's exhibits are unnumbered, this Court has numbered them sequentially beginning after the photocopy of President's First Amended Complaint (which was also an exhibit to the deposition). Those other exhibits will be cited "Dep. Ex. at —," giving the page number thus assigned by this Court.

3. President returned to "lite duty" on January 17, 1984, but on January 26 he left work on the advice of his physician and did not return until May 14, 1984 (President Dep. Ex. at 7). On April 22, 1985 President had a "Relapse of accident disability" lasting at least until June 28, 1985 (Dep. Ex. at 10).

4. President responds to Page's affidavit by asserting that because it "contains information not . . . produced pursuant to [his] discovery requests" it "should be stricken" (P–I. Mem. 5). But that argument is completely without merit. There is no requirement that a party depose its own witnesses. If President wanted Page's testimony "produced," he had every right and opportunity to depose Page during discovery (*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986)).

5. Just two days before that third suspension President had returned to work full time, after having worked half days from August 19 until September 4, 1987 to permit him to go to physical therapy. Before that (from July 13 through August 18, 1987) he had been out on disability leave due to another "relapse" of his neck injury (Dep. 128; Dep. Ex. at 23).

two times for three days each, the third time for five days (Page Aff. ¶¶ 5, 6, 8).[6] At the time of that last suspension Page told President and his Union representative that if President posed further problems he would be sent to Illinois Bell's medical department for a full examination and that his refusal to report for such an exam could result in disciplinary action, including dismissal (id.).

More than once Page and Smith also asked President to have a medical evaluation because of his alleged "mood swings" and "singing" in the office and because they "thought there was something mentally wrong with me or that I was on drugs or alcohol" (Dep. 114–16). President consistently refused to comply with those requests (Dep. 110–11). Page and Smith relied both on those concerns and on President's "behavior" in general as a justification to refuse his request to return to his systems technician job (id. 121–23, 126–27). For his part, President denies that there was any aspect of his job performance that justified a suspicion of mental, drug or alcohol problems (id. 121–22), and he also denies that he ever reported "to work under the influence of alcohol or drugs" (President Aff. ¶ 25).

On October 2, 1987 matters came to a head when before a scheduled meeting among Page, Smith, President and his Union steward (Page Aff. ¶ 9):

> [T]he plaintiff was observed talking incomprehensibly [sic], fidgeting with objects, leaving his work station every few minutes to go to the water fountain, and not performing his work. I also noticed that his eyes were blood shot and his breath smelled of alcohol. As a result of this behavior, I instructed the plaintiff to accompany me and his union steward to Illinois Bell's medical department. The plaintiff repeatedly refused my directive. As a result, I informed the plaintiff that he was being suspended indefinitely.

That episode was the catalyst for Page's decision to fire President "[b]ased on the plaintiff's overall record" (id. ¶ 10).

President says that Page insisted he have a medical evaluation, or else be immediately suspended, because of Page's still-present belief that President had a mental, drug or alcohol problem (Dep. 106–07). President was told that if he took the requested evaluation "no disciplinary action would be taken towards me" (id. 117). However, President refused and Page followed through on his suspension threat (id. 105–06).

Then on October 14, 1987 a dismissal panel (attended by President and his Union representative as well as by Page and the other Illinois Bell representatives) held a meeting at which President's fate was to be determined (Page Aff. ¶ 11). Instead of dismissing President outright, Page testified (id.):

> I, along with the other Company representatives agreed that if the plaintiff took the health evaluation and tested positive for substance abuse he would be offered substance abuse rehabilitation and when rehabilitated returned to his systems technician duties. If the plaintiff tested negative, we agreed that he would be returned to his prior duties as a system technician immediately.

President again refused to report to Illinois Bell's medical department, so Page adhered to his earlier decision to dismiss President (id.). President knows of no one else who was required to take such an evaluation, and it was his understanding that Illinois Bell had no stated policy requiring that such a procedure be followed (Dep. 163–64).

In support of President's claim that his treatment by Illinois Bell was racially motivated, he endeavors to compare that treatment to that of another systems technician Michael Bertowski ("Bertowski"). Some time during the period of President's injury Bertowski injured his arm by falling "on a piece of glass or something" and, like President, was returned to "light duty" (Dep. 158). For about a month President and Bertowski worked together "restocking the storage rooms" (id. 158–59). To President's knowledge Bertowski was never transferred to a job for which he had no prior training, nor

---

**6.** Because Illinois Bell did not rely on the reasons for those suspensions in firing President, those reasons are irrelevant here.

was he ever accused of having drug or alcohol problems (*id.* 157, 166–67). However, once President was transferred to the drafting job he did "[n]ot specifically" have any knowledge of what Bertowski was doing[7] and did not know of Bertowski's ever having any problems generally with management (*id.* 160, 162).

### Substantive Legal Standards

■ *Mojica v. Gannett Co.*, 7 F.3d 552, 561 (7th Cir.1993) (en banc) (most citations omitted) has succinctly set out President's burden on his Title VII claim against Illinois Bell:

> In any discrimination case, the plaintiff bears the ultimate burden to prove, by a preponderance of the evidence, that his employment was adversely affected by his protected class status. The plaintiff can meet this burden either by presenting direct evidence of discrimination or by successfully navigating the course of shifting burdens authorized in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 [93 S.Ct. 1817, 36 L.Ed.2d 668] (1973).

Because President has offered no evidence that on its face supports a reasonable inference of unlawful discrimination (see *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736–37 (7th Cir.1994), describing types of such evidence),[8] he—like most discrimination plaintiffs—has no choice but to attempt to create the presumption of such discrimination via the *McDonnell Douglas* methodology (*Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 522 (7th Cir.1994)).

■ There is no need to rehearse the often-repeated steps entailed in that process. Indeed, there is no need actually to follow those steps in this case—as this Court has noted more than once (*Moore v. NutraSweet Co.*, 836 F.Supp. 1387, 1395 (N.D.Ill.1993) (citations and internal quotations omitted)):

> [T]he plaintiff's prima facie showing in these cases frequently cannot be analyzed wholly discretely from the plaintiff's showing of pretext so that it is preferable to collapse the injury and focus on the showing of pretext, a position that our Court of Appeals also has taken on occasion (see, e.g., its decision affirming this Court in *McCoy*, 957 F.2d at 372).

Here President's assertions of his own satisfactory job performance and of the better treatment of similarly-situated non-black employees—required elements of his prima facie case (see *Hughes v. Brown*, 20 F.3d 745, 746 (7th Cir.1994))—necessarily overlap with Illinois Bell's explanation for his discharge. So, as in such cases as *McCoy*, 957 F.2d at 372 and (most recently by this Court) in *Cross v. Roadway Express*, 861 F.Supp. 698, 702–703 (N.D.Ill.1994), this opinion focuses on whether President has met his burden of creating a reasonable inference[9] that Illinois Bell's stated reason for dismissing him was a pretext for race-based discrimination.

### Initial Transfer

President claims that racial animus motivated his initial transfer to the drafting department (Complaint ¶ 31). However, he admits in his deposition that his injury both caused the transfer and rendered him unable to perform the physically more demanding duties of his systems technician job. Illinois Bell relies on those admissions as the basis for his transfer (I. 12(m) ¶ 5), and facially there is nothing pretextual about such a reliance. Indeed the inability to perform a job

---

7. President testified that while he was in the drafting department other persons told him Bertowski was still doing light duty as a systems technician (President Dep. 161–62). That testimony is inadmissible hearsay and cannot be considered here.

8. For example, when asked for a motive explaining Smith's role in the treatment he received in the drafting department, President said (Dep. 85):

> Why do I believe, I have no idea. Why she was harassing me. I believe that—I have no

idea. I don't know why she was harassing me. I think you'd probably have to ask her.

9. Because the principal cases in this area of the law speak of what a plaintiff must "show" or "establish," this opinion employs that usage rather than constantly describing President's burden (accurately but awkwardly) in terms of having to create genuine issues of material facts with the benefit of reasonable inferences. But any such language as to what President must prove should be understood in terms of his lesser burden of merely creating reasonable inferences—the standard that this Court has applied throughout.

is the quintessential reason for moving an employee elsewhere.

President nevertheless attempts to show that he was subjected to a race-based transfer by comparing his treatment to that of Bertowski. That effort does look in the right direction,[10] because President may demonstrate the presence of a pretextual reason by showing that other similarly situated employees received more favorable treatment (*Hiatt v. Rockwell Int'l Corp.*, 26 F.3d 761, 770 (7th Cir.1994)).

Every Title VII plaintiff must also show that the treatment he or she suffered was adverse. In this instance that has not been done as to the transfer itself (as opposed to the treatment President received afterwards). It may well have appeared adverse in President's eyes, for he would clearly have preferred to remain in his systems technician job. But the presence or absence of discrimination in such a situation hinges not on the subjective feelings of an employee but rather on the objective nature of the change in assignment and, as to the presence or absence of racial animus, on the intent of the employer in making that change. Here there is no evidence of the former (as by showing more onerous duties or less pay[11]). Nor is there evidence that Illinois Bell intended to treat President adversely by transferring him. That transfer was expected to be temporary, to end once he recovered from his injuries. As things turned out, he never did so fully, and it seems the height of irony for him to cavil at Illinois Bell's having carved out a different job for him when the lasting effects of an injury prevented him from discharging the duties of his original job.[12] And although President was originally formally reassigned as a senior drafter, that appears to have been an administrative error—his status as a systems technician was reinstated once he raised the issue.

It should be added that even if there were a reasonable inference (as there is not) that the transfer reflected adverse treatment, there would be a serious question whether President could show pretext by tendering a comparison with a single similarly situated employee[13] rather than with similarly situated *employees.* Almost without exception the cases look to the latter comparison (*Hiatt,* 26 F.3d at 770 and cases cited there; *Gustovich v. AT & T Communications, Inc.,* 972 F.2d 845, 849 (7th Cir.1992) (per curiam); *Mozee*

---

**10.** Even so, President is wrong in pointing out (P. Mem. 5) that "Defendant offers no documentation or testimony to refute Plaintiff's allegations" that Bertowski was never transferred after suffering an injury that prevented him from performing the full complement of systems technician duties. Illinois Bell is not obligated to respond to mere allegations (Rule 56(c)). Instead President must come forward with evidence to create a genuine factual issue on this subject, on which he would bear that burden of proof at trial (*Anderson,* 477 U.S. at 256–57, 106 S.Ct. at 2514–15).

**11.** President refers to Illinois Bell's "Basic Weekly Wage Rates" to support a claim that his actual and potential salary and overtime opportunities as a senior drafter were less favorable than as a systems technician. First, those documents support no such contentions—they consistently list senior drafter in the highest possible "Wage Group" (P.Ex. A at 106, 109, 112). Second, with President having formally retained his systems technician position, there is nothing to negate the natural inference that Illinois Bell continued to pay him as such. And third, as to overtime opportunities, President offers no evidence that he had any such opportunities as a systems technician either before or after his injury.

**12.** It does not require much imagination to posit the prospect that if Illinois Bell had *not* provided him with alternative employment rather than laying him off or terminating him, it would have been confronted with a differently-framed claim that it had engaged in adverse discriminatory conduct.

**13.** Illinois Bell's R. Mem. 7 incorrectly asserts that President "has presented absolutely no evidence which supports his conclusion that Bertowski was similarly situated to him." Although the comparison of the two men is cursory, both were systems technicians who suffered injuries that prevented them from performing the more physically demanding duties of that job, both formally retained their positions while being limited to light duty and both even worked together for a month restocking storage rooms. Illinois Bell has offered nothing to dispel the initial similarity between the two, so that President (armed with reasonable inferences) prevails on that one issue. But as explained later in the text, President has failed to offer anything to suggest that Bertowski's disability approached President's in duration—a highly relevant fact in finding the two of them similarly situated (or not so) for purposes of evaluating the long-term continuation of President's transfer.

*v. American Commercial Marine Serv. Co.,* 940 F.2d 1036, 1040–42 (7th Cir.1991)).[14]

*Bush v. Commonwealth Edison Co.,* 990 F.2d 928, 931–32 (7th Cir.1993) explains why that is so, in terms of the inherent unreliability of inferences as to an employer's motivation based on one-to-one comparisons. It is truly impossible for all employees to be treated with what everyone will perceive to be absolute equality. Inevitably some will be accorded treatment that they believe—and more importantly in the summary judgment context, that with favorable inferences arguably appears to be—less favorable than the treatment received by others. Thus when such a comparison is made between just two employees, with the one who receives the arguably less favorable treatment falling within a protected class while the other does not, any compelled inference that the difference in status has caused the difference in treatment would force every case to trial on that issue. Summary judgment would be rendered an impossibility.

Indeed, if a comparison between only two persons were automatically enough for a plaintiff employee to survive a Rule 56 motion, employers would be placed in a Catch-22 situation. To forestall their being confronted with triable claims predicated on such slender evidence, employers dealing with equally qualified employees would always have to favor those falling within protected classes. But in the Title VII context *everyone* is a member of a "protected class"—even white males (see, e.g., *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 280, 96 S.Ct. 2574, 2578, 49 L.Ed.2d 493 (1976) (Title VII prohibits discrimination against whites)). Thus no employment decision involving the inevitable adverse treatment of some employee would ever be invulnerable to attack by that disgruntled employee.

There are a substantial number of cases that indicate a one-on-one comparison can be sufficient to make out a prima facie case (see,

e.g., *Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1042 (7th Cir.1993); *Timms v. Frank,* 953 F.2d 281, 286 (7th Cir.1992)). In the burden-shifting universe of *McDonnell Douglas,* that would merely place the burden on the employer to *produce* some evidence of one or more similarly-situated employees in the protected class who was or were treated *more* favorably than the comparison person outside of the protected class, thus validating in practice the point made intuitively in *Bush.* But at least on the ultimate issue of pretext in the summary judgment context (where the burden of persuasion, as contrasted with production, continues to rest on the employee), it does not seem that our Court of Appeals has yet directly addressed the question whether any potential conflict exists between the *Bush* perspective and a dictum such as that in *Troupe* (see n. 14). Further enlightenment may be expected as and when that occurs.

But to return from the hypothetical to the real world, it is unnecessary for this Court to resolve the matter. What controls here instead are (1) that President has not made a sufficient showing that his original transfer (intended as it was to be temporary) was an adverse employment decision and (2) as to the longer-term aspect of his transfer to the drafter's job, (a) that such necessarily prolonged duration has also not been shown to be an adverse employment decision and (b) that Bertowski has not been shown to be similarly situated in terms of the duration of his own disability as a systems technician. In sum, Illinois Bell's Rule 56 motion must be granted as to that aspect of President's claim.

*Dismissal*

█ President also contends that Illinois Bell's refusal to transfer him back to his system technician's job and its final decision to fire him were racially motivated. It will be recalled that Illinois Bell ultimately agreed to ·restore President to his original job if he took a medical examination that

---

**14.** Only one case located by this Court's law clerk Matthew Epstein, Esq. has occasioned the text's use of the qualifier "almost." *Troupe,* 20 F.3d at 739 contains a dictum suggesting that one other employee in precisely parallel circum-

stances might get a plaintiff "halfway home" for comparison purposes—but even *Troupe* says that in the context of requiring a "comparison group" (*id.* at 738–39).

included a drug and alcohol test, with the further condition that if he tested positive for substance abuse he would first be required to complete a rehabilitation program. So the question on this facet of President's claim is whether it was pretextual for Illinois Bell to terminate him for refusing to take that test.

*Kralman v. Illinois Dep't of Veterans' Affairs*, 23 F.3d 150, 156 (7th Cir.1994) (citation, internal quotations and ellipses omitted, and adapted to speak in Title VII terms) requotes the oft-repeated standards for judicial determinations in that respect:

> [W]e do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [Title VII does] not interfere. Rather, our inquiry is limited to whether the employer gave an honest explanation for its behavior.

And this case illustrates why it is unfortunately so often necessary for courts to repeat that language or its equivalent—though nothing here even begins to suggest that Illinois Bell was medieval or high-handed or even mistaken in dealing with President, the point of such hyperbolic terminology is that he would lose even if Illinois Bell had been arbitrary rather than entirely reasonable (as it was) in its handling.

President offers up a number of arguments in an effort to stave off that inevitable conclusion. None has any merit, and none requires extended discussion.

First President argues that no substance abuse problem had previously been diagnosed by a doctor or asserted in any of his appraisals as a systems technician. But President himself acknowledges that Page's and Smith's earlier suspicions of drug and alcohol abuse by him had occasioned both (1) their asking him more than once to take a medical evaluation and (2) their refusals to retransfer him to his systems technician job. Then on October 2, 1987 Page expressly noted President's bizarre conduct, bloodshot eyes and alcohol breath. Those things pro-

vided more than ample grounds for Page's demand that President take a test as a condition of his continued employment, so that firing President for refusing to do so cannot be labeled unworthy of belief and hence pretextual.

Relatedly President contends that the only "proof" Illinois Bell offers of a substance abuse problem was Page's affidavit. That of course misses the point that Illinois Bell's burden does not call for such *proof*. Rather it need show only that the relevant decisionmaker—Page—relied on the stated rationale, as opposed to his pulling excuses for the adverse employment action out of thin air (*Aungst v. Westinghouse Elec. Corp.*, 937 F.2d 1216, 1221 (7th Cir.1991)). And *that* showing is clearly adequate.

President also points to the different treatment accorded to Bertowski, urging that because Bertowski was never required to submit to such a test, the imposition of the requirement on President must be considered pretextual. That is of course absurd—there is not a whisper in the record that Bertowski was similarly situated in the respect that is relevant here: behavior in a manner that should have or did create a suspicion of substance abuse.

Finally, President argues that calling for such tests as a condition of continued employment was neither a policy or procedure of Illinois Bell nor included in the Collective Bargaining Agreement ("CBA") between it and Union (P.Ex. A). Quite apart from the fact that his contention is without substantive support in the record,[15] even if it *were* supportable it would simply trigger application of the doctrine exemplified by *Kralman*. Nothing suggests that the requirement was a pretextual mask for racial bias.

In short, the ex-employer prevails on this final aspect of President's federal claim. Illinois Bell is entitled to a final judgment as a matter of law.

*State Law Claims*

 Lastly President contends that Illinois Bell's treatment was in violation of some

---

**15.** This Court has not been furnished evidence as to the "policies and procedures." And as for the CBA, nothing said there negates Illinois Bell's ability to impose such a requirement under the circumstances involving precedent.

unarticulated aspect of Illinois law. But in light of President's failure to survive the motion for summary judgment on his federal claims, his state claims must inevitably suffer the same fate—they are based on the same alleged conduct, and Illinois state law does not offer employees more generous protection than federal law (see, e.g., *Hiatt*, 26 F.3d at 768 n. 5).

### Claims Against Union

*Facts* [16]

President, a member of Union (U. 12(m) ¶ 5), charges it with the failure (1) to get him transferred back to his systems technician job and (2) to keep him from being fired. Those claims center on Union's representation of President in two of the nine grievances it processed on his behalf: numbers 87 077 ("077") and 87 215 ("215"), each filled out by Union business representative Larry Niemiec ("Niemiec") (P–U. 12(n) ¶¶ 5, 8, 26; P.Ex. B at 1–3, 7–9).[17]

077 relates President's grievance as based on the premise that his "temp (light duty) asignment become a permanent transfere" and that "all restrictions were removed" (apparently referring to his injury), so that he wanted to be returned to his position as a systems technician (P.Ex. B at 1). Illinois Bell representative Grabowy stated that he would "start paper work to put Bruce on Edgewater's [18] payroll" (*id.* at 2). However, because President had "shown signes of a drug problem ... Grabowy is not willing to put Bruce in a truck until Bruce 'tests' drug free at company medical" (*id.*). 077 states the "UNION POSITION" (*id.*):

> On drug issue we feel Bruce under normal conditions should not be tested. However manegment has a great deal of observations to go on.

No money is being taken from Bruce and he is on a job assignment. We have no further grievance.

In an apparent effort to get President returned to his old job Niemiec spoke with Page, who "says it's out of his hands. Take it up to 3A" (*id.* at 3). Niemiec then called a D. Richardson, but similarly "She says it's out of her hands[,] take it up. T.G.P.P.S." [19] (*id.*). Because that was the last entry in 077, it appears that Niemiec pursued the matter no further.

215 reflects President's grievance in connection with the meeting on October 2 and his firing on October 14, 1987 (P.Ex. B at 7). It says that because President was "acting strange" on "9/2/87" that led to "a confrontation" with Smith and Page, and (*id.*):

> The outcome of the meeting was an ultimatom. Go to medical and test for drugs or go home. Bruce was on warning that any strange actions on his part would bring this action.

Then an October 7, 1987 entry refers to a conference between Page, Niemiec and another union official, stating (*id.* at 8):

> UNION POSITION: We feel Bruce is being forced into a situation here. Bruce feels he has no problem yet is being pushed into taking tests he doesn't wish to take. Bruce wants to be left alone and to do his job as a systems tech in the Edgewater garage.
>
> COMPANY POSITION: Page feels Bruce has shown strange behavior over and over. The time has come for Bruce to test or go home. Page points out that Bruce has had many, many problems taking instruction and strange behavior in the last 9 months.

215 goes on to report the October 14, 1987 meeting and says (*id.* at 9):

> UNION POSITION: We feel this action is the end result of about 11 months of effort by local manegment. S. Smith has built a

---

**16.** As will be seen, some of what follows in the text was potentially relevant to Illinois Bell's motion. Those facts were not recounted earlier only because they were not relied on by Illinois Bell.

**17.** All quotations from the grievances are verbatim transcriptions (this opinion therefore omits any "sic" notations for misspelled words). All

references in those quotations to "Bruce" of course denote President.

**18.** That is apparently the Illinois Bell facility where President worked as a systems technician.

**19.** No explanation of those initials is given.

case on Bruce and placed him in this position. Bruce denies having any problem and his only desire is to do 8 hr work in his job as a systems tech in the Edgewater garage. Bruce refuses to take any test just on the principle of it.

COMPANY POSITION: Shirley [Smith] noticed strange behavior, not sitting still for any length of time, talking in a non understandable manor, popping Tic Tac candies in his mouth. Bruce went on to become buligerant with Shirley telling her she needed a psychiatrist. Herman Page was called and told Bruce to go to medical for testing, Bruce said no. His I.D. was taken and he was sent home.

CONCLUSION: Bruce was given till 5PM 10/14/87 to take a drug test. Bruce declined even to take Grabowy's phone number on the chance he would change his mind. The Company offered to help Bruce if he was on drugs then send him back to Edgewater, either way it was a win, win offer to get Bruce back to Edgewater.

Niemiec has confirmed that Illinois Bell routinely required medical examinations at its medical department of those employees that were transferring "to more physically strenuous job duties" and of those where there was "just cause" to suspect drug or alcohol abuse in order "to ascertain the use, or non-use, of prohibited drugs or alcohol while on duty" (U. 12(m) ¶¶ 9–10; Niemiec Aff. ¶¶ 7–8). Niemiec also says that Illinois Bell's offer to President—to return to Edgewater, either immediately if he passed the drug and alcohol test or following successful completion of a "Drug-alcohol Rehabilitation Program" if he did not pass the test—was the same as the treatment offered to other employees where there was "just cause" to suspect similar abuse (U. 12(m) ¶ 11; Niemiec Aff. ¶ 9).[20]

After President was terminated on October 14, 1987, Union records reflect that he did not offer to take either a medical evaluation or a drug and alcohol test, nor did he file any additional grievances (U. 12(m) ¶¶ 12–

13). On November 10, 1987 Union wrote this letter to President (P.Ex. C):

> In the course of processing your grievance, this Local Union has carefully considered the likelihood of obtaining a reasonable solution to your dismissal.
>
> It has been concluded, in light of all the circumstances, that further processing of the grievance is not warranted.
>
> Please consider this letter as official notification that this Local Union will not process your grievance further.

*Substantive Legal Standards and Their Application*

President's Complaint alleges:

1. Union "failed to represent him by denying him the right to file grievances in a timely fashion" (Complaint ¶¶ 39, 46).

2. That failure "constituted aiding and abetting" Illinois Bell in its Title VII violation (Complaint ¶¶ 40, 47).

3. Union's behavior was itself a violation of Title VII because Union treated non-black members better (Complaint 41, 44).

Those assertions clearly charge Union with race discrimination in violation of Title VII. And Complaint ¶¶ 39 and 46 are also readable as claiming that Union failed adequately to represent President, even without ascribing that treatment to any racially discriminatory bias. Indeed, Union Mem. 1 and 3–4 construed the Complaint in precisely that way.

 In the latter respect, unions have a "judicially evolved" duty of fair representation even without reference to the NLRA (*Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 79, 83–84, 110 S.Ct. 424, 432, 434–35, 107 L.Ed.2d 388 (1989)). In advancing grievances on behalf of a member, "the union functions in a manner not wholly unlike that of an attorney representing a client in court" (*Thomas v. United Parcel Serv., Inc.*, 890 F.2d 909, 919 (7th Cir.1989)), so that (*id.*):

> is not enough under Rule 56(e) or GR 12(n), so Union's assertions must be credited on the current motion.

---

**20.** President attempts to respond only by stating he "has no knowledge of the facts set forth" (P–U. 12(n) ¶¶ 9–11; President Aff. ¶¶ 19, 20). That

Throughout the grievance process, the union representative has but one loyalty—to promote the good of the individual member.... In such a situation, the duty of fair representation requires the union to assist the grievant in securing the materials necessary for a fair hearing before the committee, putting forward the strongest arguments one could reasonably make on the grievant's behalf, and, when warranted, conducting a meaningful investigation of the underlying facts giving rise to the petition.

 Because that duty may plainly be breached whether or not the employer is guilty of any wrongdoing, an employee may bring a claim against his or her union independently of claims asserted against an employer (*Breininger*, 493 U.S. at 82–83, 110 S.Ct. at 434). As for the standard of proof for such a claim, *Trnka v. Local Union No. 688, UAW*, 30 F.3d 60, 61 (7th Cir.1994) teaches:

> To prevail on a claim that his union violated its duty of representation by dropping a grievance, a plaintiff-member must show that the union's decision was arbitrary or based on discriminatory or bad faith motives.[21]

Existence of a genuine issue as to any one of those three elements suffices to defeat a summary judgment motion (*Griffin v. Air Line Pilots Ass'n, Int'l*, 32 F.3d 1079, 1083 (7th Cir.1994)).

 *Trnka's* reference to "discriminatory ... motives" meshes directly with President's Title VII claim against Union. Where such a Title VII claim is predicated on a breach of the duty to represent, a prima facie showing involves both a breach of that duty and proof that "there was some indication that the Union's actions were motivated by discriminatory animus" (*Babrocky v. Jewel Food Co.*, 773 F.2d 857, 868 (7th Cir.1985)).

 Here President has offered no evidence whatever of any such tainted motivation. He has not compared the representation he received with that accorded to any other union members,[22] and he has offered no written or oral statements that can even remotely be viewed as reflecting such an animus. That failure dooms not only his Title VII claim against Union but also any fair representation claim grounded on an assertedly racially discriminatory motive. And that same failure applies to President's allegation of "handicap" discrimination, for nothing suggests that Union took President's injuries into account in representing him.

As for the second possible underpinning for a failure-to-represent claim, it is also true that "bad faith requires inquiry into the subjective motivation behind union action" (*Trnka*, 30 F.3d at 63). Again President proffers nothing to that effect. It is irrelevant that he *knows* of no other member who was required to take a drug and alcohol test as a precondition to a job transfer, for that ignores the critical elements of President's own conduct that triggered the requirement and of Niemiec's sworn statement of Illinois Bell's regular practice of imposing such requirements in like circumstances. In short, there is a total failure even to hint at bad faith on Union's part.

As to the final potential for a claim of unfair representation, *Ooley*, 961 F.2d at 1302 (citation to *O'Neill* and internal quotations omitted) states:

> As such, a union only violates the arbitrary prong of the analysis when the union's actions are so far outside a wide range of reasonableness that the actions rise to the level of irrational or arbitrary conduct.

**21.** [Footnote by this Court] Union has cited *Camacho v. Ritz–Carlton Water Tower*, 786 F.2d 242, 243–44 (7th Cir.1986) and *Hoffman v. Lonza, Inc.*, 658 F.2d 519, 522 (7th Cir.1981) for the proposition that an employee must show "intentional misconduct" by a union to establish a failure-to-represent claim. But *Ooley v. Schwitzer Div., Household Mfg., Inc.*, 961 F.2d 1293, 1302 (7th Cir.1992) has since recognized that this Circuit's unduly restrictive standard in that respect has been rejected by *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 74–75, 111 S.Ct. 1127, 1134, 113 L.Ed.2d 51 (1991).

**22.** As with Illinois Bell's evidence referred to in n. 11, President simply seeks to disclaim knowledge in response to Union's proof of the absence of any differences in its handling of grievances (P–U. 12(n) ¶ 14). Again he fails under Rule 56(e) and GR 12(n)—he was free to employ discovery to demonstrate otherwise (*Anderson*, 477 U.S. at 257, 106 S.Ct. at 2514–15).

Under this extremely deferential standard, courts should not substitute their judgment for that of the union, even if, with the benefit of hindsight, it appears that the union could have made a better call.

Hence President's burden on summary judgment is not merely to create a reasonable inference that Union should have acted otherwise, but rather to show that Union's position "could eventually be deemed not even colorable, thus creating an issue of material fact regarding arbitrariness" (*Trnka*, 30 F.3d at 61–62).

There is no way in which President can advance such a position in good faith. Union processed both of his grievances and succeeded in getting some relief for President. In grievance 077 Union was able to get President's title of systems technician reinstated, although it could not actually get him returned to that position. And in grievance 215 Union did get Illinois Bell to agree to return President to that position, although Union could not prevail on Illinois Bell to drop its insistence that President take the medical evaluation including a drug and alcohol test.

In that last respect, again the uncontroverted evidence from Niemiec is that Illinois Bell imposed such requirements whenever there was "just cause" to suspect drug or alcohol abuse. To that end Union need not show that President actually had a substance abuse problem to justify Union's ultimate acquiescence in Illinois Bell's demand—all that is required is Union's reasonable belief that Illinois Bell had the requisite "just cause" to demand the evaluation. That standard is clearly satisfied by grievances 077 and 215, which reflect that Illinois Bell's people had witnessed behavior by President that was consonant with substance abuse. By the same token, once President was discharged and continued to refuse to take the medical evaluation, Union's November 10, 1987 statement of its decision not to process his grievance further also cannot constitute a breach of the duty of fair representation.

■ What has been said up to now also dispatches President's allegation that Union aided and abetted Illinois Bell in its violation of Title VII (Complaint ¶ 40). As Union correctly states, aiding and abetting is a concept of criminal law whose general civil law equivalent is conspiracy, articulated under Title VII in Section 2000e–2(c):

It shall be an unlawful employment practice for a labor organization . . .

(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

Because President has shown no attempted discrimination by either Union or Illinois Bell, that claim too falls by the wayside.

Finally President asserts an undefined state law claim against Union, just as he did against Illinois Bell. What this opinion has already said as to the latter also dooms the former.

### Conclusion

All of President's allegations against both defendants have proved to be utterly without evidentiary support sufficient to meet the Rule 56 standards. Because there is no genuine issue of material fact, both Illinois Bell and Union are entitled to a judgment as a matter of law. This action is dismissed with prejudice.