Jo Ann LEFFEL, Plaintiff–Appellant,

v.

VALLEY FINANCIAL SERVICES and Valley American Bank and Trust Company, Defendants–Appellees.

No. 96–1077.

United States Court of Appeals, Seventh Circuit.

Argued May 16, 1996.

Decided May 15, 1997.

Rehearing and Suggestion for Rehearing En Banc Denied June 16, 1997.

Robert A. Yingst (argued), Boothby & Yingst, Berrien Springs, MI, for Plaintiff–Appellant.

Jeffery A. Johnson, Christopher A. Nichols (argued), May, Oberfell & Lorber, South Bend, IN, for Defendants–Appellees.

Before POSNER, Chief Judge, and ESCHBACH and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Jo Ann Leffel lost her job as a branch manager with Valley American Bank in 1993. She filed this suit contending that she was discharged in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, because she suffers from multiple sclerosis. The district court granted summary judgment in favor of the defendants, finding that Leffel had not produced evidence that she was meeting her employer's legitimate expectations or that her medical condition had influenced the decision to discharge her. We affirm.

## I.

Leffel began work for Valley American Bank in 1980. Beginning in 1988, she served as the manager of the downtown Mishawaka, Indiana branch of that Bank.[1] She earned average to above average marks on her annual reviews, and not until 1993, shortly before her discharge, was she ever subject to a reprimand or formal discipline by the Bank. In her December 1992 performance review, Leffel was given an overall performance rating of 2+, with a 2 indicating that the employee's work "meets, or in some aspects exceeds [the] requirements of the position" and a 3 indicating that her work "frequently exceeds [the] job requirements in several aspects; [that the employee performs] better than satisfactory employees with similar responsibilities; [that she] attains good accomplishments and end results[; and that] [m]inimum direction [is] required." Leffel received ratings of 2, 3, or 4 ("consistently performs well above most employees on a comparable level") with respect to all performance attributes except for timeliness. In that category she was rated a 1, indicating that her performance was "barely adequate," required monitoring, and would be cause for dismissal in the absence of improvement.

In March of 1993, Sheila Ann Swinehart, a parttime teller at the downtown branch, contacted Margaret Andrysiak, Director of Human Resources for the Bank, to express concern about Leffel. Among other things, Swinehart told Andrysiak that there was a lack of communication between Leffel and her staff and that Leffel appeared to be "overly medicated." That phone call led to a breakfast meeting with Leffel's staff (to which she was not invited) and a decision by Bank management to place Leffel on probation.

On March 15, 1993, Leffel was called to a meeting with Bank vice-president Jerome Kearns, Debra Peffley (Bank Center Administrator and Leffel's supervisor), and Andrysiak. Kearns read to Leffel a list of ten perceived problems with Leffel's performance, including excessive absenteeism, failure to submit reports on a timely basis, failure to return phone calls from other departments, failure to communicate information to her staff, and a reluctance to attend compulsory meetings. R. 47 Ex. K. Kearns then reviewed with Leffel a second list of twelve items that specified what was expected of Leffel in the way of improvement in these and the other problem areas discussed. *Id.* Ex. M. Leffel was ultimately called upon to sign a third document acknowledging that she was being placed on probationary status

---

1. Leffel asserts that at one time (in approximately February 1992), she was responsible not only for the downtown Mishawaka branch of the Bank, but two others as well. As best we can determine from the record, however, at the time of her discharge she was responsible solely for the downtown branch.

effective the following day and would be terminated if she failed to meet the level of performance expected of her. *Id.* Ex. L. That document also listed "other options" of which Leffel might avail herself, including an unpaid leave of absence, paid medical leave, or resignation. *Ibid.*

During that meeting, Leffel disclosed that she suffered from multiple sclerosis, a degenerative disease of the central nervous system. Leffel had been diagnosed with the disease in 1979, but prior to this time it had not affected her work and with two exceptions she had not revealed the diagnosis to her co-workers. She had, however, disclosed her condition on a medical form when the Bank had altered its insurance plan the previous December, and Leffel suggests that Andrysiak may have been made aware of it in after a representative of the Bank's insurer disclosed it to one of Andrysiak's subordinates. Leffel also had the impression that everyone present at the March 15 meeting was already aware that she had MS, although Kearns and Peffley later indicated that this was the first they had heard of it. Andrysiak apparently had already been informed of Leffel's MS, as Leffel suggests, although Andrysiak claimed to have forgotten until "reminded" of it at this meeting. She maintained she had never passed that information along to Kearns and Peffley. In any event, according to Leffel, she was directed over her own objection to disclose her MS to her staff. She did so the following day.

At that same meeting, Leffel was also given paperwork for her physician to sign in the event she elected to seek long-term disability leave. Leffel later gave the papers to her doctor, who refused to sign them, believing that Leffel retained the ability to work. Leffel herself maintains that she remained fully able to work and needed no accommodation to remain in her job.

On April 8, 1993, Kearns, Peffley, and Andrysiak met once again with Leffel to discuss her performance during the probationary period. At that meeting, Leffel was given and asked to sign a report discussing her conduct relative to the list of performance expectations she had been given at the March 15 meeting. R. 50 Ex. 22. In some areas (ab-

sences, for example), no shortcomings were noted. Problems were noted in other areas, however. For example, Leffel was still not returning business-related telephone calls in a timely fashion. Moreover, in certain respects, Leffel had conducted herself in a fashion that the Bank deemed paranoid. Leffel appeared unwilling to deal with her assistant, Carolyn Teeter, whom the Bank had made responsible for monitoring Leffel's performance. Moreover, apparently in response to the concerns raised about her timely reporting for work, Leffel had also begun to log her arrival and departure using the safe deposit time clock, which the Bank regarded as distracting and unacceptable. The report summary stated:

> Problems still continue at D.T. Mishawaka under Joann's [sic] leadership. She is resentful if the support staff goes to Carolyn. Joann herself complains about Carolyn to support staff which must stop immediately. Joann is paranoid about every phone call, each conversation with a fellow employee and tries to talk Carolyn into accepting another job. Joann does not feel she is acting strangely or doing anything wrong; and, feels that the Bank does not want her to go on long-term disability. A routine call from a sick employee upsets Joann if she learns that the information has been passed on to Branch Administration. The situation at the branch has become strained and this situation has to be alleviated.

*Id.* at 2. The report concluded with a recommendation that Leffel either obtain long-term disability leave or be removed from her duties as the manager of the downtown Mishawaka branch. Although Kearns, Peffley, and Andrysiak deny terminating Leffel at this meeting, she contends that they did. According to Leffel, her keys to the branch were taken from her, she was told to make an appointment with Peffley if she wanted to remove her personal belongings, the closing of her account with the Bank was discussed, and she was issued a final paycheck for the four weeks of unused vacation time she had accrued. April 8 was the last day that Leffel worked for the Bank.

Leffel eventually filed suit against the Bank and its holding company, Valley Financial Services, contending that she had been discharged in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* At the conclusion of discovery, the defendants moved for summary judgement, arguing that the Bank had placed Leffel on probation and then discharged her[2] not on the basis of her asserted disability,[3] but because she was failing to meet the Bank's legitimate performance expectations. Upon review of the record, the district court found that Leffel had not established a genuine dispute of fact in this regard. The court considered first the decision to place Leffel on probation. Although Leffel's performance evaluations for 1990 through 1992 had all been satisfactory, the court pointed out that those evaluations did not speak to her conduct in early 1993, when the complaints about her behavior surfaced. Memorandum and Order at 19. Leffel had done little to rebut these criticisms directly, the court found, beyond making conclusory assertions that they were meritless and that her performance was satisfactory. In certain instances, she attempted to offer explanations for the circumstances giving rise to the complaints about her work, but these explanations did not tend to show that her performance was, in fact, adequate. *Id.* at 19–20. At the same time, Leffel had offered no evidence from which a reasonable factfinder might conclude that the Bank's stated reasons for placing her on probation were not credible or that the Bank actually was motivated by her disability. *Id.* at 20–21. As to Leffel's termination, the court again found that with one exception, Leffel had failed to address the bulk of the concerns raised at the follow-up meeting on her last day of work. *Id.* at 22–23. Likewise, she had again pointed to no evidence suggesting that the Bank had terminated her because of her disability rather than the perceived problems with her work. *Id.* at 23–24.

Although Ms. Leffel asserts her own reasons as to why the Bank wanted to get rid of her, the facts that she presents amount to no more than speculation; they cannot give rise to the inference of intentional discrimination. At most, these facts support the proposition that she was terminated despite her condition, and not because of it. Ms. Leffel clearly wishes she had been give[n] more of a chance to explain herself, but her evidence would not allow a jury to find that her performance was adequate or that the Bank's stated reason was merely a pretext for intentional discrimination. The Bank is entitled to summary judgment.

*Id.* at 24 (citation omitted).

Leffel subsequently moved for reconsideration, tendering the affidavits of Arlene Sorenson, a teller who had worked under Leffel's supervision, and Mary Watterud, a Bank customer. R. 70 Ex. 1; R. 71 Attachment. Both individuals spoke in glowing terms of Leffel's service and capabilities. Although the district court indulged the assumption that these affidavits were, as Leffel contended, unavailable to her previously, it found them insufficient to establish a question of fact as to whether Leffel was performing to the Bank's satisfaction. Sorenson's affidavit, although highly favorable in its assessment of Leffel, did not speak specifically to the reasons that the Bank had articulated for placing her on probation and then removing her from her post; nor did it otherwise suggest that these reasons were a pretext for discrimination. Reconsideration Memorandum and Order at 5–6. Likewise, even if Watterud's affidavit, along with the complimentary affidavits of two other customers Leffel had submitted previously, tended to establish across-the-board customer satisfaction with her work, they did not address the specific criticisms that Bank management had voiced. *Id.* at 6–7. The court therefore denied Leffel's motion to reconsider.

## II.

We review the district court's summary judgment ruling de novo, considering

**2.** The defendants conceded, for purposes of the motion for summary judgment, that the Bank had, in fact, discharged Leffel.

**3.** The court had some doubt as to whether Leffel had presented sufficient evidence that she qualified as a disabled individual, but it did not dispose of the case on that basis.

the evidence and the inferences that one might reasonably draw from it in a light that most favors Leffel. *Greenslade v. Chicago Sun–Times, Inc.*, slip op. at 2, 112 F.3d 853, 856–57 (7th Cir.1997); *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir.1997). As this is an employment discrimination case, we also take care not to resolve any genuine disputes that have been properly established as to the employer's intent and credibility. *See id.* The court's decision to deny Leffel's motion for reconsideration is one we review for abuse of discretion only. *Edward Gray Corp. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 94 F.3d 363, 367 (7th Cir. 1996).

The ADA prohibits an employer from discriminating against "a qualified individual with a disability because of the disability of such individual...." 42 U.S.C. § 12112. "Disability" is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." *Id.* § 12102(2). Leffel's position is not that she has any physical or mental impairment, or any record of such impairment, as the result of MS, but that she was regarded as having such an impairment by other Bank employees and officials. Although the Bank disputes that point, we shall assume, as the district court did, that Leffel indeed was regarded as having a physical or mental impairment and thus is entitled to claim the protection of the ADA. We shall also assume, although this point too is disputed, that the Bank ultimately did discharge Leffel at the follow-up meeting on April 8. The focus of the district court's ruling, and the principal question that the parties address in this appeal, is whether Leffel has come forward with enough evidence to suggest that she was placed on probation and then discharged because of her perceived disability to avoid summary judgment.

As in any other type of employment discrimination case, a plaintiff may establish that she was discharged in violation of the ADA by direct or indirect means. *DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 797 (7th Cir.1995). Leffel points us to no direct proof that she was disciplined and then discharged because she has MS, and instead points to circumstantial evidence that she believes gives rise to that inference. The district court examined this evidence within the burden-shifting framework that the Supreme Court first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See also Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Although this analysis derives from Title VII cases, we saw no reason in *DeLuca* not to apply it to ADA claims (53 F.3d at 797); and our sister circuits have likewise found the analysis appropriate to this context. *See Lawrence v. National Westminster Bank New Jersey*, 98 F.3d 61, 68 & n. 7 (3d Cir. 1996) (collecting cases). Within the *McDonnell Douglas* framework, it falls to the plaintiff to first establish a prima facie case of discrimination. If she succeeds in doing so, the defendant must then articulate a legitimate, non-discriminatory reason for discharging her. At that juncture, the plaintiff must then establish that this proffered reason is really a pretext for discrimination. *DeLuca*, 53 F.3d at 797.[4]

A cautionary word is in order as to what kind of evidence the plaintiff must produce in order to establish a prima facie case. "[T]he prima facie case requires 'evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion....'" *O'Connor v. Consolidated Coin Caterers Corp.*, —— U.S. ——, ——, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996) (quoting *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977) (emphasis found in *O'Connor* removed)); *see also Burdine*, 450 U.S. at 253–

---

4. This is not a case in which the plaintiff has charged her employer with a failure to make a reasonable accommodation to her disability. The *McDonnell Douglas* burden-shifting framework typically is not applicable in that context. *See Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1283 (7th Cir.1996).

54, 101 S.Ct. at 1094. Since the Supreme Court first articulated the components of the prima facie case in *McDonnell Douglas* (*see* 411 U.S. at 802, 93 S.Ct. at 1824), district courts and courts of appeals alike have often suggested that as part of her prima facie case, a plaintiff complaining of discrimination typically must show that she was rejected in favor of or replaced by someone of a different race or sex, for example, or in a case like this one, by someone who is not disabled. *See, e.g., Hill v. Burrell Communications Group, Inc.*, 67 F.3d 665, 668 (7th Cir.1995); *Sample v. Aldi Inc.*, 61 F.3d 544, 548 (7th Cir.1995). The Supreme Court's opinion in *O'Connor* makes clear, however, that such proof is not inevitably necessary. —— U.S. at ——, 116 S.Ct. at 1310. There the Court rejected the notion that a person contending that he was discharged in violation the Age Discrimination in Employment Act ("ADEA") must show that he was replaced by someone outside the group of persons protected by the statute (in other words, someone under the age of 40) in order to make out a prima facie case of age discrimination:

> As the very name "prima facie case" suggests, there must be at least a logical connection between each element of the prima facie case and the illegal discrimination for which it establishes a "legally mandatory, rebuttable presumption," *Burdine, supra,* at 254, n. 7, 101 S.Ct., at 1094, n. 7. The element of replacement by someone under 40 fails this requirement. The discrimination prohibited by the ADEA is discrimination "because of [an] individual's age," 29 U.S.C. § 623(a)(1), though the prohibition is "limited to individuals who are at least 40 years of age," § 631(a). This languages does not ban discrimination against employees because they are aged 40 or older; it bans discrimination against employees because of their age, but limits the protected class to those who are 40 or older. The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out *because of his age.* Or to put the point more concretely, there can be no greater inference of *age* discrimination (as opposed to "40 or over" discrimination) when a 40 year-old is replaced by a 39 year-old than when a 56 year-old is replaced by a 40 year-old. Because it lacks probative value, the fact that an ADEA plaintiff was replaced by someone outside the protected class is not a proper element of the *McDonnell Douglas* prima facie case.

—— U.S. at ——, 116 S.Ct. at 1310 (emphasis in original). Following *O'Connor's* lead, we have disavowed prior cases from this circuit suggesting that a Title VII plaintiff must show that she was replaced by someone of a different race, sex, and so on. *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir.1996) (per curiam). We emphasized that although that kind of proof "may help to raise an inference of discrimination," it is not required to make out a prima facie case, so long as there is some evidence from which one can infer that the employer took adverse action against the plaintiff on the basis of a statutorily proscribed criterion. *Id.*; *see also Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1397–98 (7th Cir.1997).

▪ We take the opportunity to reiterate here what we believe to be the central point of both the Supreme Court's opinion in *O'Connor* and our own opinion in *Carson*: that the nature of the proof giving rise to the requisite inference of discrimination cannot be reduced to a formula that will serve any and all discrimination cases. We noted in *DeLuca*, for example, that in the context of a reduction-in-force suit, the plaintiff would have to establish as the final element of his prima facie case that employees not in the class of persons protected by the ADA were treated more favorably than he. 53 F.3d at 797 (citing *Oxman v. WLS–TV*, 846 F.2d 448, 455 (7th Cir.1988)). We also took care to note, however, that "[t]he *McDonnell Douglas* test was never meant to be applied rigidly," and that the elements of the prima facie case as we had described them might change as the case law applying the ADA evolved. *Id.* n. 4. *DeLuca's* framing of that final element of the prima facie case-proof that persons not disabled or perceived to be disabled were treated more favorably than the plaintiff—actually tracks comparable language found in a host of other discrimination

cases. *See, e.g., Wallace,* 103 F.3d at 1398 (national origin discrimination); *Denisi v. Dominick's Finer Foods, Inc.,* 99 F.3d 860, 864 (7th Cir.1996) (age discrimination); *Geier v. Medtronic, Inc.,* 99 F.3d 238, 241 (7th Cir.1996) (sex discrimination-pregnancy); *Cheek v. Peabody Coal Co.,* 97 F.3d 200, 203–04 (7th Cir.1996) (sex discrimination). Evidence of disparate treatment is certainly one of the most obvious ways to raise an inference of discrimination absent direct proof of discriminatory animus. It should not be understood as the only means of doing so, however. A branch manager like Leffel, for example, occupies a position of significantly greater responsibility and discretion than that of most other bank employees. When cited for purported shortcomings in her performance, she may find it difficult to find evidence of disparate treatment in criticisms that are intertwined with the unique aspects of her position. But there may be other circumstances that bespeak discrimination. A bank officer who is praised and given wide discretion in the performance of her duties one day but is confronted with a laundry list of manufactured criticisms and confining performance standards the next may be able to raise an inference that discrimination is afoot by establishing that the only intervening event was the disclosure that she is disabled. All that is necessary is that there be evidence reasonably suggesting that the employer would not have taken adverse action against the plaintiff had she not been disabled and everything else had remained the same. *See Carson,* 82 F.3d at 158. "Any demonstration strong enough to support a judgment in the plaintiff's favor if the employer remains silent will do, even if the proof does not fit into a set of pigeonholes." *Id.* at 159. With all that in mind, Leffel would have to show the following in order to satisfy her initial burden under the *McDonnell Douglas* framework: (1) that she is disabled within the meaning of the ADA, (2) that her work performance met her employer's legitimate expectations, (3) that she was discharged, and (4) that the circumstances surrounding her probation and discharge indicate that it is more likely than not that her disability was the reason for these adverse actions. *See Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 58 (4th Cir.1995).

■ Our focus here is on the second of these elements—whether Leffel was meeting the Bank's legitimate expectations. As Judge Miller pointed out, that question necessarily overlaps with the veracity of the performance-related reasons that the Bank cited for placing Leffel on probation and then dismissing her from her post. Memorandum and Order at 18 (citing *President v. Illinois Bell Tel. Co.,* 865 F.Supp. 1279, 1285 (N.D.Ill. 1994)). We agree with the district court that Leffel has not carried her burden on this aspect of the prima facie case.

Leffel has failed to address with any specificity the Bank's reasons for putting her on probation and then, when it deemed her subsequent performance insufficiently improved, asking her to leave. In the initial disciplinary meeting on March 15, the Bank identified some ten areas of concern. We mentioned some of them previously in our summary of the facts. In granting the Bank's motion for summary judgment, the district court noted that Leffel had for the most part failed to respond to these concerns with anything but vague and generalized assertions that she was a competent employee and that the Bank's criticisms were meritless. Memorandum and Order at 19–20. The same shortcomings characterize her appellate presentation. Leffel argues that she was "well qualified" to continue as branch manager and that "her performance was more than simply adequate but was in fact exemplary." Leffel Br. 17. She points to the satisfactory performance statistics of the downtown Mishawaka branch as evidence that her conduct was in no way impeding the success of the Bank. But surely an employer does not have to wait until its bottom line is affected to discipline an employee whose work is found wanting. Leffel addresses only one or two of the concerns that the Bank cited in placing her on probation. She notes, for example, that although she was cited for wearing unprofessional attire—tennis shoes—the casual shoes were necessitated by an injury to her foot and in fact she had been given permission by her superiors to wear them. But the

bulk of the deficiencies attributed to her are left unaddressed. Similarly, although Leffel criticizes the Bank's assessment of her subsequent performance during the probationary period, she does nothing to demonstrate that she had brought her performance to an acceptable level. Instead, she resorts to her previous performance reviews, which indicate that her performance met expectations in most areas. In so doing, she wholly ignores the district court's observation that the latest of these reviews took place in December 1992, and that it was several months later, in March 1993, when Bank management was made aware of the problems staff members at the downtown Mishawaka branch were observing with Leffel's conduct. The reviews themselves were not unqualified—problems were noted even then with Leffel's timeliness, for example, and that is a concern which crops up in the list of items discussed with Leffel at the March 15 meeting. So the satisfactory reviews Leffel received previously do not call into question the criticisms that culminated in her discharge.

 In attempting to show that the Bank's criticisms of her work were pretextual, Leffel places much emphasis on what seems to her to be the suspicious sequence of the events preceding her discharge: shortly after she revealed to the Bank's health care insurer that she had MS, concern was expressed that she appeared "overly medicated," Andrysiak met with Leffel's staff without notice to Leffel herself, a laundry list of performance concerns was presented to her, it was suggested that she might want to consider seeking disability leave, and she was

told to inform her staff that she had MS. Whether we may infer that Bank officials knew that Leffel had MS before she disclosed it during the initial disciplinary meeting is the subject of certain evidentiary arguments into which we need not delve. The sole question with which we are concerned is whether the Bank's complaints about Leffel's performance were genuine or whether they were merely a cover for a decision to force her out because the Bank perceived her to be disabled. Even if we assume that the Bank knew from the outset that Leffel had MS, there simply is no evidence from which one might reasonably infer that its decision to place her on probation and then to ask her to leave were based on her perceived disability rather than upon actual shortcomings in her work.[5] Beyond this, any shortcomings in the Bank's handling of the situation (its request that she disclose her MS to her staff, for example) are not subject to redress within the confines of her complaint.

 Other issues are raised in this appeal, including Valley Financial Services' liability for the discrimination, if any, committed by its wholly-owned subsidiary and the propriety of the district court's decision to deny the motion for reconsideration that Leffel filed after the adverse summary judgment ruling. The former issue we need not address, given our agreement that the entry of summary judgment against Leffel was proper. The motion for reconsideration was addressed to the district court's judgment, and we do not think the district court in any way abused its discretion. We have reviewed the affidavits that Leffel relied upon in seeking

5. Leffel points to several other circumstances that purportedly reveal an aversion to employees with health problems and to people with MS in particular. She notes that when the Bank held a meeting to discuss a change in its health insurance coverage, there was an air of disgruntlement about the fact the Bank had been forced to make the change due to an increase in insurance rates, and that the increase was attributed to employees with chronic health problems. She also notes that certain Bank employees had expressed discomfort with a customer in the advanced stages of MS. She points to a remark by Kearns that if something were not done about the perceived shortcomings in Leffel's performance, the Bank would lose employees. And finally, she notes that when her subordinates

were told upon her departure that she had taken medical leave, one or more of them expressed the hope that if she returned to work, it would not be at the downtown Mishawaka branch. What Leffel reads into all of this is that the Bank wanted to rid itself of employees who, like her, had medical conditions that were expensive and made co-workers ill at ease, and so it invented a set of criticisms that would justify discharging her. Her perception may or may not be correct. What dooms her case, however, is her failure to confront the criticisms that the Bank has articulated. Beyond cursory reference to her prior reviews, Leffel makes virtually no effort to show that her performance met legitimate expectations and that the reasons given for her termination were in fact pretextual.

reconsideration, and we agree with the district court that although highly complimentary of Leffel, particularly with regard to her customer service skills, they do not call into question the Bank's stated reasons for disciplining Leffel.

## III.

For the reasons discussed, we AFFIRM the grant of summary judgment in favor of the defendants as well as the denial of Leffel's motion to reconsider that ruling.