**Helen K. MIRZA, Plaintiff,**

v.

**The DEPARTMENT OF THE TREASURY, an Executive Department of the United States Government, through Robert E. Rubin, in his capacity as Secretary of the Department of the Treasury; The Office of Thrift Supervision, an agency of the Department of the Treasury, through Nicolas P. Retsinas, in his capacity as Director, Defendants.**

**No. 93 C 3122.**

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 11, 1998.

Susan Bogart, Law Office of Susan Bogart, Chicago, IL, Katrina Veerhusen, Attorney at Law, Chicago, IL, for plaintiff.

Ann L. Wallace, Assistant U.S. Attorney, U.S. Attorney's Office, Chicago, IL, Mary Stowell, Linda Debra Friedman, Erika E. Pederson, Leng, Stowell, Friedman & Vernon, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

The plaintiff, Helen K. Mirza, sued the defendants, the Department of Treasury ("Treasury"), through Secretary Robert E. Rubin, and the Office of Thrift Supervision ("OTS"), through Director Nicolas P. Retsinas, alleging violation of Title VII of the Civil Rights Act ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), and the Equal Pay Act ("EPA"). After previous de-

cisions in this case,[1] Title VII and ADEA claims remain pending against Treasury and EPA claims remain pending against Treasury and OTS. Both Treasury and OTS move for summary judgment on the remaining claims. For the following reasons, the motions are granted.

### Local Rule 12(M) and 12(N)

Local Rule 12(M) requires the party moving for summary judgment to file "a statement of material facts as to which the moving party contends there is no genuine issue and . . . [that] shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavit, parts of the record, and other supporting materials relied upon to support the facts set forth in the paragraph." The party opposing summary judgment must file "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon. . . ." Local Rule 12(N)(3)(a). If there are any other facts that require the denial of summary judgment the opposing party must file a statement of additional facts and support the facts with citation to the record. Local Rule 12(N)(3)(b). The Seventh Circuit has consistently upheld the strict application of the Local Rules. *Brasic v. Heinemann's Inc.*, 121 F.3d 281, 284 (7th Cir.1997); *Schulz v. Serfilco, Ltd.*, 965 F.2d 516, 519 (7th Cir.1992).

Compliance with Local Rules 12(M) and 12(N) saves significant judicial resources by parsing out the contested factual issues for the court and providing a basis for factual disputes. The concept behind Local Rule 12(M) and 12(N) is the simplification of the summary judgment process. The Local Rules are not an invitation for abusive satellite litigation.

The defendants have submitted three separate Local Rule 12(M) Statements and four separate summary judgment memoranda. Each Rule 12(M) Statement and memorandum deals with a different claim or time period. Accordingly, one Rule 12(M) Statement will be referred to as "Discrimination Rule 12(M) Statement ¶ _," another as "Pre–FIRREA Rule 12(M) Statement ¶ _," and another as "Pay Act Rule 12(M) Statement ¶ _." Ms. Mirza's Rule 12(N) Response will be similarly titled.

Ms. Mirza has objected to nearly every Local Rule 12(M) paragraph of uncontested fact the defendants present. Many of these objections are frivolous and indicate a glaring misunderstanding of the Federal Rules of Evidence. For instance, Ms. Mirza objects to the defendants' use of her deposition testimony as hearsay. Such testimony is, as any lawyer should know, a party admission and not hearsay. Ms. Mirza's frolic has required this court to expend considerable time wading through her morass of objections. Having done so, only Discrimination Rule 12(M) paragraph 18 and Pre–FIRREA Rule 12(M) paragraphs 4, 18, and 31 are clearly deficient. Ms. Mirza has not properly responded to Discrimination Rule 12(M) paragraphs 24, 27, 30, 44, 57, 58; Pay Act Rule 12(M) paragraphs 12, 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 25, 26, 27, 28, 29, 30, 31; and Pre–FIRREA Rule 12(M) paragraphs 5, 9, 12, 13, 17, 19, 23, 25, 27, 30, 32, by either not controverting the facts or not meeting Rule 12(N)'s requirement of supporting denials with citation to exhibits. "It is not [the] task . . . of the district court[ ] to scour the record in search of a genuine issue of triable fact." *Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 251 (7th Cir.1995). Accordingly, those paragraphs are deemed admitted. Additionally, in other responses Ms. Mirza has both properly and improperly responded, often by failing to support part of her denial with citation to exhibits. Those deficient sections of paragraphs that have not been struck in their entirety have been ignored.

Ms. Mirza consistently cites exhibits throughout her memorandum of law that were not presented to the court in either her Rule 12(N) Response or a Rule 12(N) Statement of Additional Facts. This is plainly improper. This tactic prohibits the defendants from meaningfully responding to Ms. Mirza's additional facts and exhibits and re-

---

1. *Mirza v. Department of Treasury*, 875 F.Supp. 513 (N.D.Ill.1995); *Mirza v. Department of Treasury*, No. 93 C 3122, 1994 WL 30551 (N.D.Ill. Feb.3, 1994).

quires the court to sort through pages of exhibits to determine if they support the statements in Ms. Mirza's memorandum of law. The court has wasted enough time sorting through Ms. Mirza's Local Rule 12(N) Response. Accordingly, all exhibits cited in Ms. Mirza's memorandum of law that were not cited in her Rule 12(N) Response are stricken for failure to comply with the Local Rules. *Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311, 1313–17 (7th Cir.1995) (finding appropriate a district court's refusal to consider facts and exhibits cited in a brief but not in a Rule 12(N) Statement of additional facts).[2]

## Background[3]

### A. Reduction-in-force.

Helen K. Mirza is a female over forty years of age. (2d Amended Comp. ¶ 1). In January, 1975, the Federal Home Loan Bank of Chicago ("Bank") hired Ms. Mirza as a Supervisory Analyst. (Discrimination Rule 12(M) Statement ¶ 1). Ms. Mirza was promoted to Supervisory Agent and Assistant Vice President in June, 1984, and to Vice President in September, 1988. (Discrimination Rule 12(M) Statement ¶ 1; Discrimination Rule 12(N) Response ¶ 1). In 1987 Ms. Mirza agreed to head up a newly created mergers and acquisitions unit at the Bank. (Discrimination Rule 12(M) Statement ¶ 2; Discrimination Rule 12(N) Response ¶ 2).

In 1989 Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") which abolished the Federal Home Loan Bank Board and transferred its regulatory functions to OTS, an office within Treasury. (Discrimination Rule 12(M) Statement ¶¶ 4–5). After enactment of the FIRREA Ms. Mirza transferred to OTS and became the Industry Rehabilitation Manager, which required the handling of mergers and acquisitions of insolvent institutions. (Discrimination Rule 12(M) Statement ¶ 6; Discrimination Rule 12(N) Response ¶ 6). Ms. Mirza worked in the Central Region in Chicago, Illinois. (Discrimination

Rule 12(N) Response ¶ 6). Ms. Mirza was asked to: (1) facilitate recapitalization of undercapitalized thrifts; (2) bring together potential investors in the thrift industry and undercapitalized savings and loans institutions; (3) oversee the transfer of failing savings and loan associations to the Resolution Trust Corporation ("RTC"); (4) foster interest in recapitilizing savings and loans through mergers and acquisitions and other means; (5) deliver documents at receiverships, maintain investor files, and maintain contact with the investment community; and (6) perform certain liaison duties with the Federal Deposit Insurance Corporation ("FDIC"). (Discrimination Rule 12(M) Statement ¶ 7).

The number of thrift institutions in OTS's Chicago District Central Region decreased between 1989 and 1992. Thrifts were sold, liquidated, merged, and converted to state charters. (Discrimination Rule 12(M) Statement ¶ 8; Discrimination Rule 12(N) Response ¶ 8). Under an OTS rating system used to assess the health of the savings and loan industry, by June, 1992, 600 thrifts in the Central Region were classified as either "well-capitalized" or "expected to meet capital requirements." (Discrimination Rule 12(M) Statement ¶¶ 9–10). This amounted to 89% of the Central Region's thrifts. (Discrimination Rule 12(M) Statement ¶ 10). Only four thrifts were given the lowest rating and were expected to need government assistance. By November, 1992, two these four thrifts had been resolved and two had been transferred to the RTC. *Id.* Ms. Mirza testified that between 1989 and mid–1992 the number of unhealthy thrifts in the Central Region diminished. (Discrimination Rule 12(M) Statement ¶ 11).

In early 1992 Stuart Brafman, OTS's Regional Director, and Ronald Karr, OTS's Regional Deputy Director, assigned Ms. Mirza, in her capacity as Industry Rehabilitation Manager, to cover the entire seven states of

---

**2.** Treasury's motion to strike certain of Ms. Mirza's exhibits is denied as moot.

**3.** Unless otherwise noted, all of the Rule 12(M) Statements and 12(N) Responses cited in the "Background" section are not disputed by the

parties, not properly disputed by the parties (as noted above), or, after considering the supporting materials, cannot in good faith be disputed by the parties.

the Central Region. (Discrimination Rule 12(M) Statement ¶ 14).[4] At that time the OTS analyst assigned to the Industry Rehabilitation unit was reassigned to another position. (Discrimination Rule 12(M) Statement ¶ 15). Ms. Mirza began reporting to a new supervisor, Philip Gerbick. (Discrimination Rule 12(M) Statement ¶ 16). While OTS suggests Ms. Mirza's workload diminished after the regionalization due to a decrease in ailing thrifts, Ms. Mirza suggests her workload increased during this time. (Discrimination Rule 12(M) Statement ¶ 16; Discrimination Rule 12(N) Response ¶ 16). Ms. Mirza admits the number of thrifts being transferred to the RTC dwindled after the regionalization. (Discrimination Rule 12(M) Statement ¶ 17).

OTS imposed a hiring freeze in 1992. (Discrimination Rule 12(M) Statement ¶ 19). In March or April 1992 Mr. Karr decided to abolish the Industry Rehabilitation Manager position. (Discrimination Rule 12(M) Statement ¶ 20). Ms. Mirza's duties as Industry Rehabilitation Manager were transferred to Assistant Directors, Mr. Gerbick, and others. (Discrimination Rule 12(M) Statement ¶ 21). OTS offered Ms. Mirza a position as Examiner V, Grade 21. (Discrimination Rule 12(M) Statement ¶ 25). An Examiner V is a Senior Examiner who conducts field examinations of thrifts and prepares examination reports on his or her findings. (Discrimination Rule 12(M) Statement ¶ 56). Although the position was a Grade below Ms. Mirza's Industry Rehabilitation Manager position, the position was offered without a reduction in salary or benefits. (Discrimination Rule 12(M) Statement ¶ 25). Ms. Mirza accepted the Examiner V position. (Discrimination Rule 12(M) Statement ¶ 26).

*B. Deputy Regional Director position in La Palma, California.*

After Ms. Mirza accepted the position as Examiner V she applied for the position of Deputy Regional Director in OTS's West Region La Palma, California office. (Discrimination Rule 12(M) Statement ¶ 34). The La Palma Deputy Regional Director position was posted nationally in September, 1992. (Discrimination Rule 12(M) Statement ¶ 35). Ms. Mirza's application was handled by Lee Jordan in the Human Resources Division in Washington, D.C. (Discrimination Rule 12(M) Statement ¶ 36). Mr. Jordan received seven applications for the position. Six of the applications were from men and the seventh from Ms. Mirza. Of the seven applicants, four were over the age of forty. Five of the applicants were from the West Region. (Discrimination Rule 12(M) Statement ¶ 37). Mr. Jordan sent the applications to Janice Roudebush, Regional Deputy Director for Administration in OTS's West Region. Ms. Roudebush forwarded the applications to Eric Shand, Regional Director of the West Region. (Discrimination Rule 12(M) Statement ¶ 38). Mr. Shand was responsible for recommending a candidate for the Regional Deputy Director position.

Mr. Shand decided to limit consideration for the Regional Deputy Director position to the five candidates from the West Region. (Discrimination Rule 12(M) Statement ¶ 40). Mr. Shand decided to limit consideration to West Region candidates because the West Region was undergoing downsizing and he hoped to boost morale and confidence by hiring from within the Region. (Discrimination Rule 12(M) Statement ¶¶ 44–46). Mr. Shand was not aware of Ms. Mirza's age when he decided to limit consideration for the position to West Region candidates. (Discrimination Rule 12(M) Statement ¶ 41).

After discussing the candidates with a variety of individuals Mr. Shand recommended Richard Sanchez, a 37 year-old male, for the position. (Discrimination Rule 12(M) Statement 51 49–50). Mr. Sanchez was appointed the Regional Deputy Director in December, 1992. (Discrimination Rule 12(M) Statement ¶ 51).

Ms. Mirza filed an internal Equal Employment Opportunity ("EEO") complaint with Treasury alleging gender and age discrimination for failure to promote her to the Regional Deputy Director position. Ms. Mirza

---

**4.** The parties refer to the addition of states to Ms. Mirza's responsibilities as a "regionalization" or

her position.

concedes she did not include a claim for retaliation in her EEO complaint. (Discrimination Rule 12(M) Statement ¶ 54).

### C. Performance Evaluation.

While she was the Industry Rehabilitation Manager between January and March, 1992, Ms. Mirza was supervised by Chester Bierdon. Between March and August, 1992, Ms. Mirza reported to Philip Gerbick. After becoming an Examiner V in August, 1992, Renaldo Salonis supervised Ms. Mirza (Discrimination Rule 12(M) Statement ¶ 55). Ms. Mirza was the only Senior Examiner without prior experience as an Examiner. Mr. Salonis placed Ms. Mirza with an experienced Examiner to provide guidance for Ms. Mirza's switch from Industry Rehabilitation Manager to Senior Examiner. (Discrimination Rule 12(M) Statement ¶ 57).

Ms. Mirza's 1992 performance was evaluated by all three supervisors to whom she reported during the year. (Discrimination Rule 12(M) Statement ¶ 59). On a five level scale, Mr. Salonis rated Ms. Mirza at level 2 for the three to four months she was a Senior Examiner. A level 2 rating indicates the employee is performing at a "minimally acceptable" level. (Discrimination Rule 12(M) Statement ¶ 58). Mr. Salonis concluded Ms. Mirza's work was that of an entry level Examiner. Id. Mr. Bierdon and Mr. Gerbick, the individuals that supervised Ms. Mirza while she was the Industry Rehabilitation Manger, evaluated her at level 3. A level 3 indicates the employee is "fully successful" in his or her job. (Discrimination Rule 12(M) Statement ¶ 59). Ms. Mirza was given an overall rating of level 3 in her 1992 performance evaluation and a merit increase in salary. (Discrimination Rule 12(M) Statement ¶ 60).

In April, 1993, Ms. Mirza filed an EEO complaint contending that she should have received a 1992 evaluation of level 5, indicating "exceptional" work, as both the Industry Rehabilitation Manager and an Examiner V. Ms. Mirza alleged age and sex discrimination. (Discrimination Rule 12(M) Statement ¶¶ 63-64). In October, 1993, Ms. Mirza filed an Individual Complaint of Employment Discrimination with Treasury. She checked the boxes for age and sex discrimination, but not the retaliation box. (Discrimination Rule 12(M) Statement ¶ 66).

### D. Pre–FIRREA Age Discrimination Claims.

As early as 1986 Ms. Mirza suspected that she was the victim of age discrimination. (Pre–FIRREA Rule 12(M) Statement ¶ 10). Based on discussions she had while working at the Bank, Ms. Mirza suspected she was being undercompensated. (Pre–FIRREA Rule 12(M) Statement ¶¶ 6-7). Based on other discussions Ms. Mirza also believed younger employees were receiving "extraordinary salary increases" and superior performance ratings. (Pre–FIRREA Rule 12(M) Statement ¶¶ 8-9). After becoming the head of mergers and acquisitions Ms. Mirza felt some of her job duties were assigned to younger employees and that the younger employees refused to cooperate with her when she tried to perform certain duties. (Pre–FIRREA Rule 12(M) Statement ¶ 11).

In 1987 Ms. Mirza began to complain to her superiors about the younger employees' lack of cooperation. (Pre–FIRREA Rule 12(M) Statement ¶ 12). In particular, Ms. Mirza complained to her supervisor, Chester Biedron, that younger employees were performing her job function and refusing to cooperate with her. (Pre–FIRREA Rule 12(M) Statement ¶ 13). In 1988 Ms. Mirza became interested in the vacant position of Applications Department Head at the bank. (Pre–FIRREA Rule 12(M) Statement ¶ 14). The position was filled by Philip Gerbick, an individual Ms. Mirza knew to be younger than her. (Pre–FIRREA Rule 12(M) Statement ¶ 16).

At some point prior to February, 1981, Ms. Mirza met with an attorney to discuss whether she had been illegally discriminated against. (Pre–FIRREA Rule 12(M) Statement ¶ 21). In 1984 Ms. Mirza graduated from law school, passed the Illinois bar examination, and became a licensed attorney. (Pre–FIRREA Rule 12(M) Statement ¶ 24). In November, 1989, Ms. Mirza drafted a memorandum to her superiors complaining of sex discrimination and stating she might file an EEOC complaint and a civil suit to ad-

dress the monetary ramifications of discrimination over the span of her career at the Bank. (Pre–FIRREA Rule 12(M) Statement ¶ 17). Shortly before drafting the memorandum Ms. Mirza met with an employment law attorney. (Pre–FIRREA Rule 12(M) Statement ¶ 20). Neither Ms. Mirza nor any of her lawyers ever filed a charge or notice to sue with the EEOC or any lawsuit before the instant suit was commenced. (Pre–FIRREA Rule 12(M) Statement ¶ 27).

*E. Equal Pay Act*

When Ms. Mirza began working at OTS she was initially called a Group Leader. She eventually took the title of Industry Rehabilitation Manger. (Pay Act Rule 12(M) Statement ¶ 2). Ms. Mirza's position was unique in that "she lead a team of analysts who dealt exclusively with failing institutions." (Pay Act Rule 12(M) Statement ¶ 3; Ex. A at 10). Ms. Mirza's job responsibilities did not materially change from the time she began employment with the OTS to the elimination of the Industry Rehabilitation Manger position. (Pay Act Rule 12(M) Statement ¶ 5).

Until March, 1992, Ms. Mirza reported directly to Mr. Bierdon. Mr. Bierdon was OTS's Deputy District Director from October, 1989 to January, 1991, and OTS' Regional Deputy Director beginning in January, 1991. (Pay Act Rule 12(M) Statement ¶ 10). Ms. Mirza was assigned work on a thrift institution only after Mr. Bierdon and one or more Assistant Directors determined the thrift was insolvent or likely to become insolvent. (Pay Act Rule 12(M) Statement ¶ 11). Ms. Mirza was not involved in ascertaining which thrifts were proper candidates for her caseload and, even after a thrift was assigned to her, Ms. Mirza did not perform the day-to-day supervision and examination of the thrift. (Pay Act Rule 12(M) Statement ¶¶ 12–13).

Ms. Mirza supervised three employees, but did participate in management-level administrative discussions concerning OTS organizational matters and OTS's future. (Pay Act Rule 12(M) Statement ¶ 14). In addition to overseeing Ms. Mirza' work, Mr. Bierdon was responsible for planning, directing, and overseeing the examination and supervision of between 164 and 300 thrifts. (Pay Act Rule 12(M) Statement ¶ 15). Mr. Bierdon supervised between 60 and 110 employees and also performed a variety of administrative duties dealing with office procedures, the budget, and training. (Pay Act Rule 12(M) Statement ¶ 16). Alan Esterman and Robert Lindgren, Assistant Directors, were responsible for overseeing a team of approximately 25 to 30 employees and were responsible for a variety of administrative duties, including preparing the Central Region's policies and attending meetings on OTS organizational matters. (Pay Act Rule 12(M) Statement ¶¶ 17–18).

Philip Gerbick was OTS's Deputy District Director of Corporate Activities from October, 1989, to January, 1991, and its Regional Deputy Director for Technical Support beginning in January, 1991. Mr. Gerbick supervised between 20 and 39 employees and began supervising Ms. Mirza in March, 1992. (Pay Act Rule 12(M) Statement ¶¶ 19–20).

Ms. Mirza was the highest paid Examiner V. (Discrimination Rule 12(M) Statement ¶ 27; Pay Act Rule 12(M) Statement ¶ 28). Ms. Mirza received a 1992 salary of $74,4604 and a 1993 salary of $75,350. (Pay Act Rule 12(M) Statement ¶¶ 25–27). In December, 1993, Ms. Mirza was given the position of Community Affairs Liaison at Grade 22. (Discrimination Rule 12(M) Statement ¶ 28; Pay Act Rule 12(M) Statement ¶¶ 29). As Community Affairs Liaison Ms. Mirza was responsible for promoting thrifts' awareness of the Community Reinvestment Act ("CRA"), keeping abreast of thrifts' CRA performance, and maintaining contact with community groups and state and local government officials about reinvestment issues. (Pay Act Rule 12(M) Statement ¶ 30). Ms. Mirza was the only Community Affairs Liaison in the Central Region. (Pay Act Rule 12(M) Statement ¶ 31). Ms. Mirza's salary increased to $76,480 in 1994, $78,392 in 1995, and $80,744 in 1996. (Discrimination Rule 12(M) Statement ¶ 29). In October, 1996, Ms. Mirza resigned from the OTS to accept a position at the Federal Reserve Bank of Chicago. (Discrimination Rule 12(M) Statement ¶ 30).

Title VII and ADEA

Since Ms. Mirza presents no evidence of direct discrimination, she must rely on the burden-shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to prove gender and age discrimination. Ms. Mirza must first establish a prima facie case of discrimination by showing: (1) she belongs to a protected class, (2) she performed her job satisfactorily, (3) she suffered an adverse employment action, and (4) that the circumstances surrounding the adverse employment action indicate it is more likely than not her protected classification was the reason for the adverse action. *Leffel v. Valley Fin. Services*, 113 F.3d 787, 794 (7th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 416, 139 L.Ed.2d 318 (1997); *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir.1997); *Denisi v. Dominick's Finer Foods, Inc.*, 99 F.3d 860, 864 (7th Cir.1996). If Ms. Mirza makes out a prima facie case of discrimination, the burden of production shifts to Treasury to articulate a "legitimate, nondiscriminatory reason for its action." *Plair,* 105 F.3d at 347. Should Treasury meet the burden of showing a nondiscriminatory reason for its action, the burden shifts back to Ms. Mirza to show Treasury's explanation is simply a pretext for discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 804, 93 S.Ct. 1817; *Denisi*, 99 F.3d at 864.

*A. Reduction-in-force.*

■ Treasury argues Ms. Mirza cannot make out a prima facie case of discrimination based on the RIF because she did not suffer an adverse employment action and it did not treat similarly situated employees outsider her classification more favorably.

Treasury argues that since Ms. Mirza did not suffer a salary decrease or a loss of benefits when she became an Examiner V she did not suffer an adverse employment action. "The question whether a change in an employee's job or working conditions is materially adverse, rather than essentially neutral, is one of fact ... and so can be resolved on summary judgment only if the question is not fairly contestable." *Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270,

273–74 (7th Cir.1996). "A transfer involving no reduction in pay and no more than a minor change in working conditions [is not an adverse employment action]." *Id.* at 274. While Ms. Mirza did not suffer a decrease in salary, her Grade level was lowered from Grade 22 to Grade 21. Additionally, the requirements of her position substantially changed. As Industry Rehabilitation Manager Ms. Mirza was responsible for facilitating recapitalization of thrifts and aiding in the transfer of thrifts to the RTC. As an Examiner V Ms. Mirza conducted field examinations of thrifts and prepared examination reports on her findings. Based on Ms. Mirza's diminished responsibilities and the lowering of her Grade level there is a genuine issue of fact as to whether she suffered an adverse employment action.

■ Treasury suggests that because Ms. Mirza was the only Industry Rehabilitation Manager in the Central Region there were no other similarly situated employees that were treated more favorably when Ms. Mirza's position was eliminated. Treasury relies on cases that indicate the fourth prong of the prima facie case requires the plaintiff to show a defendant treated similarly-situated employees outside her classification more favorably. *Oxman v. WLS–TV*, 846 F.2d 448, 455 (7th Cir.1988). Treasury, however, takes too narrow a view of the fourth prong of the prima facie case. The Seventh Circuit has recently noted a plaintiff in a discrimination case need not "show that she was replaced by someone of a different race, sex, and so on .... so long as there is some evidence from which one can infer that the employer took adverse action against the plaintiff on the basis of a statutorily proscribed criterion." *Leffel,* 113 F.3d at 793. "All that is necessary is that there be evidence reasonably suggesting that the employer would not have taken adverse action against the plaintiff had she not been [in the protected class] and everything else had remained the same." *Id.* at 794.

Thus, it is not necessary that Ms. Mirza show that similarly situated individuals outside of her classification were treated more favorably. Still, Ms. Mirza must present some evidence that her age and gender were

more likely than not the reason for the RIF. *Id.* In her affidavit, Ms. Mirza states that after the RIF the duties and responsibilities of the Industry Rehabilitation Manager were distributed to four younger males. (Pl.Ex. AAA ¶ 16).[5] Ms. Mirza suggests these individuals avoided a RIF because they assumed her job duties. While this evidence is minimal, at this stage Ms. Mirza only has the burden of making out a prima facie case of discrimination. Ms. Mirza meets the prima facie case requirements.

■ The burden shifts to Treasury to articulate a legitimate, nondiscriminatory reason for the RIF. *Plair*, 105 F.3d at 347. Treasury states that between 1989 and 1992 the number of failing thrifts significantly diminished. (Discrimination Rule 12(M) ¶¶ 8–11). By 1992 only four thrifts were anticipated to need governmental assistance. *Id.* Treasury states that as the number of ailing thrifts diminished the need for an Industry Rehabilitation Manager diminished. Based on the decreased workload, Treasury decided to abolish the Industry Rehabilitation Manager position and distribute its remaining duties to other employees.

■ Treasury has presented a legitimate, nondiscriminatory reason for the RIF. The burden shifts back to Ms. Mirza to show that Treasury's explanation is simply pretext for discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 804, 93 S.Ct. 1817; *Denisi*, 99 F.3d at 864. Ms. Mirza may demonstrate pretext by providing "evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge." *Testerman v. EDS Technical Prod. Corp.*, 98 F.3d 297, 303 (7th Cir.1996). Ms. Mirza loses if Treasury "honestly believed in the nondiscriminatory reasons it offered, even if the reasons are foolish or trivial or even baseless." *Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 890 (7th Cir.1997). The burden rests with Ms. Mirza to prove Treasury did not honestly believe in the reasons it proffered for her termination. *Wolf v. Buss*

*(America) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996).

Ms. Mirza, through her affidavit, suggests that the regionalization of her job in 1992 increased her duties and thus, at the time of the RIF her caseload had not diminished. (Pl.Ex. AAA ¶ 16). As above, Ms. Mirza also notes that after the RIF her job responsibilities were handled by younger males. *Id.* Ms. Mirza suggests that she lost her position so that her duties could be assigned to other individuals who would then be secure in their jobs. *Id.*

Ms. Mirza admitted, however, that the number of failing thrifts being transferred to the RTC was dwindling in 1992. (Discrimination Rule 12(M) Statement ¶ 17). Ms. Mirza's affidavit is devoid of any specific evidence to rebut Treasury's proof that only four thrifts would require government assistance in 1992. Those four thrifts were resolved by November, 1992. (Discrimination Rule 12(M) Statement ¶ 10). Further, the regionalization of Ms. Mirza's position is in accord with a decline in the number of struggling thrifts. A decline in the number of struggling thrifts permitted her to cover a larger territory and resulted in a temporary increase in her caseload. Still, the thrift industry got healthier and the need for an Industry Rehabilitation Manager lessened. Indeed, at the time of the regionalization, the OTS analyst assigned to the Industry Rehabilitation unit was reassigned. (Discrimination Rule 12(M) Statement ¶ 15). After Ms. Mirza's position was abolished the residual responsibilities of the Industry Rehabilitation Manager position took up only one percent of the duties of those individuals that took over the work. (Discrimination Rule 12(M) ¶ 21). There is simply no proof except Ms. Mirza's unsupported affidavit that the jobs of younger males were saved by abolishing the Industry Rehabilitation Manager position.

"Rule 56 requires [a plaintiff] to produce *specific facts* that cast doubt upon [a defendant's] stated reasons for its action or raise significant issues of credibility." *Rand v. CF*

---

**5.** Since Ms. Mirza's affidavit was cited in her Rule 12(N) Response it is properly before the court.

*Indus., Inc.,* 42 F.3d 1139, 1146 (7th Cir. 1994) (emphasis in original). The conclusory comments in Ms. Mirza's affidavit fail to support a reasonable inference of discrimination or call into question the integrity of OTS's decision. Ms. Mirza has not rebutted Treasury's showing that it believed the health of the thrift industry no longer necessitated an Industry Rehabilitation Manager. Accordingly, Ms. Mirza's Title VII and ADEA claims in connection with the RIF fail.

*B.  La Palma, California Position.*

██   Ms. Mirza argues her failure to receive a promotion to the Deputy Regional Director position in La Palma, California was due to sex and age discrimination. Treasury says Ms. Mirza cannot make out a prima facie case because she was not similarly situated to the other applicants for the Deputy Regional Director position since the other applicants were from the West Region.

As noted above, it is not necessary for Ms. Mirza to show that similarly situated individuals were treated more favorably. Ms. Mirza must, however, produce some evidence that the circumstances surrounding the promotion denial indicate it is more likely than not her protected classification was the reason for the denial. *Leffel,* 113 F.3d at 794. Ms. Mirza expends a single paragraph arguing that Treasury has a history of excluding females from promotion to upper level jobs. (Pl. Brief at 13). Based on her failure to comply with Local Rule 12(N), Ms. Mirza's argument is unsupported by the record. Additionally, this evidence does not deal with Ms. Mirza's promotion denial to the Regional Deputy Director position and is not a substitute for evidence showing she has suffered discrimination. *Plair,* 105 F.3d at 348.

Ms. Mirza also argues the promotion denial was discriminatory because: (1) the selection process excluded everyone from outside California;   (2) Lee Jordan's and Eric Shand's affidavits contradict each other; (3) and the individual that received the promotion, Richard Sanchez, was younger and male. Mr. Shand decided to exclude everyone from outside the West Region from the selection process. This included Ms. Mirza

and another applicant who was male and over the age of forty. (Discrimination Rule 12(M) ¶ 37). Mr. Shand was not aware of Ms. Mirza's age when he decided to limit consideration to the West Region candidates. (Discrimination Rule 12(M) ¶ 41). It is unreasonable to conclude Mr. Shand acted discriminatorily based on age or sex when he was unaware of Ms. Mirza's age and he also excluded a male from consideration because he was not from the West Region. While Ms. Mirza states Mr. Jordan's and Mr. Shand's affidavits contradict each other she does not explain how they contradict each other or why any contradiction is relevant to her discrimination claim.

An inference of discrimination, however, may be drawn from the fact that Mr. Sanchez, a younger male, was chosen for the Regional Deputy Director position. Although it is unclear whether this evidence suffices to make out a prima facie case under the Seventh Circuit's recent interpretation of *McDonnell Douglas Corp.*'s fourth prong, it would have been sufficient under the previous standard that required a plaintiff to show an individual outside the plaintiff's classification was treated more favorably. Drawing every reasonable inference in favor of Ms. Mirza, I conclude she makes out a prima facie case of discrimination.

██   Treasury has presented a legitimate, nondiscriminatory reason for hiring Mr. Sanchez. Mr. Shand decided to limit consideration to West Region candidates because the West Region was undergoing downsizing and he hoped to boost morale and confidence by hiring from within the Region. (Discrimination Rule 12(M) Statement ¶¶ 44–46). It is Mr. Mirza's burden to show this explanation is pretext. She offers the same evidence to prove pretext that she offered to establish a prima facie case. This evidence is insufficient to show Treasury's stated reason for hiring from within the West Region and excluding Ms. Mirza is pretext. Accordingly, Ms. Mirza's Title VII and ADEA claim in connection with the promotion to the Deputy Regional Director position fail.

## C. Performance Evaluation.

■ Ms. Mirza argues her receipt of a level 3 rating on her 1992 performance evaluation was the result of age and sex discrimination. Treasury argues Ms. Mirza cannot make out a prima facie case because she has not suffered an adverse employment action and has not shown similarly situated male employees received better evaluations. Seventh Circuit case law indicates that an undeservedly negative performance evaluation, standing alone, does not constitute an adverse employment action even if the plaintiff is denied a larger pay raise due to the evaluation. *Rabinovitz v. Pena*, 89 F.3d 482, 488–89 (7th Cir.1996).

Regardless, although Ms. Mirza need not show similarly situated males were treated more favorably, she must present some evidence that indicates her evaluation was the product of her age or gender. She does not meet even this minimal burden. Ms. Mirza states she has presented evidence of the subjective nature of Treasury's performance appraisal system and that age and sex biases run throughout comments contained in performance appraisals at Treasury. Ms. Mirza cites no specific evidence and relies on an interrogatory answer that, due to her failure to properly submit a Local Rule 12(N) Statement, is not before this court. Furthermore, the interrogatory answer cites no record evidence to support Ms. Mirza's claims. (Pl.Ex. TT). Ms. Mirza also argues that her "senior" status had an impact on her evaluation and was a "potential code word for discrimination on the basis of age." (Pl. Brief at 14). Ms. Mirza presents no evidence that she was on some type of "senior" status or that such status, in any way, has relevance to this case.

In sum, Ms. Mirza presents no evidence that her performance evaluation was linked to her gender or age. Accordingly, her Title VII and ADEA claim based on her 1992 performance evaluation fail.

## D. Retaliation

Ms. Mirza argues the RIF, promotion denial, and performance evaluation were all in retaliation for the November, 1989 memorandum she wrote to her superiors complaining of sex discrimination. Treasury argues that because Ms. Mirza did not comply with administrative exhaustion requirements by bringing her retaliation complaints to an EEO counselor her claims are barred and, even if they are not barred, Ms. Mirza fails to make out a prima facie case of retaliation or rebut Treasury's legitimate, nondiscriminatory reasons for its actions.

■ To make out a claim for retaliation under the *McDonnell Douglas* burden-shifting method Ms. Mirza must show that "(1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) there is a causal link between the protected expression and the adverse action." *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1313 (7th Cir. 1989). Putting aside Treasury's administrative exhaustion arguments, it is clear Ms. Mirza fails to make out a prima facie case of retaliation. The record is wholly devoid of any evidence that would link the 1992 RIF, performance evaluation, and promotion denial to the memorandum Ms. Mirza wrote in 1989. Although "generally, a plaintiff may establish [a causal] link through evidence that the [adverse action] took place on the heels of the protected activity," the retaliation Ms. Mirza complains of took place years after the protected speech. *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir.1994). The only other evidence in the record regarding the November, 1989 memorandum is Ms. Mirza's affidavit stating District Director Stuart Brafman, after receiving the memorandum, told her that he no longer had confidence in her judgment. (Pl.Ex. AAA ¶ 10). It was Ronald Karr, however, who decided to abolish the Industry Rehabilitation Manager position. (Discrimination Rule 12(M) Statement ¶ 20). Additionally, there is no evidence that Mr. Brafman had any input into the La Palma position or Ms. Mirza's 1992 performance evaluation. Simply put, there is no evidence of a causal link between Ms. Mirza's memorandum and her complaints of retaliation.[6]

---

**6.** Ms. Mirza's inability to rebut Treasury's legitimate, nondiscriminatory reasons for the RIF and promotion denial also doom her retaliation claims.

As for Ms. Mirza's exhaustion of her administrative remedies, Ms. Mirza did not address Treasury's argument that she failed to bring the alleged discriminatory promotion denial and performance evaluation to the attention of an EEO counselor. (Pl. Brief at 29). Title VII specifically requires a federal employee to exhaust her administrative remedies before filing suit. *McGuinness v. United States Postal Serv.*, 744 F.2d 1318, 1319–20 (7th Cir.1984). Under the ADEA, a federal employee may either file suit after giving the EEOC thirty days' notice of intent to sue, or file an administrative complaint and, after final disposition by the EEOC or her employer, or after 180 days if the complaint is not acted upon, she may file suit in federal court. *Adler v. Espy*, 35 F.3d 263, 264–65 (7th Cir.1994).

Although Ms. Mirza filed an EEO complaint for age and gender discrimination based on her promotion denial, she admits she did not claim in the complaint that the promotion denial was retaliatory and did not check the box for retaliation on the complaint. (Discrimination Rule 12(M) ¶ 54). Ms. Mirza also filed an EEO complaint for age and gender discrimination based on her 1992 performance evaluation. Ms. Mirza did not check the box for retaliation on the EEO complaint form. (Discrimination Rule 12(M) ¶ 65). Ms. Mirza also admits that the individual claim she filed with the Treasury Department did not have a specific claim of retaliation based on the November, 1989 memorandum. (Discrimination Rule 12(M) ¶ 68). A review of Ms. Mirza's EEO and Treasury complaints fails to uncover any evidence of a retaliation claim for the 1992 promotion denial or performance evaluation. (Df.Exs.35, 37, 51, 52).

In sum, Ms. Mirza's retaliation claim based on the RIF fails for failure to make out a prima facie case or to show pretext. Ms. Mirza's retaliation claims based on the promotion denial and 1992 performance evaluation fail based on her inability to make out a prima facie case or to exhaust her administrative remedies.

## Equal Pay Act

■ Ms. Mirza may prove a prima facie violation of the Equal Pay Act by showing: "(1) that different wages are paid to employees of the opposite sex; (2) that the employees do equal work which requires equal skill, effort, and responsibility; and (3) that the employees have similar working conditions." *Fallon v. State of Ill.*, 882 F.2d 1206, 1208 (7th Cir.1989) (citations omitted). Ms. Mirza claims Treasury and OTS violated the EPA while she was the Industry Rehabilitation Manager, an Examiner V, and the Community Affairs Liaison.[7]

■ Treasury and OTS argue that as the Industry Rehabilitation Manager Ms. Mirza did not do equal work that required equal skill, effort, and responsibility as male employees. "The crucial finding on the equal work issue is whether the jobs to be compared have a 'common core' of tasks, i.e., whether a significant portion of the two jobs is identical." *Id.* at 1209 (quotations omitted). "There is a gray area ... between 'very much alike,' which is within the scope of the [EPA], and 'comparable,' which is outside; for it is plain that Congress did not want to enact comparable worth as part of the Equal Pay Act of 1964." *E.E.O.C. v. Madison Community Unit Sch. Dist. No. 12*, 818 F.2d 577, 582 (7th Cir.1987). Substantial identity between jobs is required for two jobs to fall within the purview of the EPA. *Id.* This is a factual determination. *Fallon*, 882 F.2d at 1208.

When Ms. Mirza began working at OTS she was initially called a Group Leader. She eventually took the title of Industry Rehabilitation Manager. (Pay Act Rule 12(M) Statement ¶ 2). Ms. Mirza's position was unique in that "she lead a team of analysts who dealt exclusively with failing institutions." (Pay Act Rule 12(M) Statement ¶ 3; Ex. A at 10). Ms. Mirza's job responsibilities did not materially change from the time she began employment with the OTS to the RIF of the Industry Rehabilitation Manager position. (Pay Act Rule 12(M) Statement ¶ 5). Ms.

---

7. In a previous opinion I found Ms. Mirza's EPA claims are limited to the jobs she held after May 24, 1990. *Mirza*, 875 F.Supp. at 522.

Mirza was primarily responsible for: (1) finding means and facilitating recapitalization of undercapitalized thrifts; (2) transferring thrifts to the RTC; (3) acting as a liaison with the FDIC; (4) handling a program that matched potential investors with undercapitalized savings and loans; and (5) maintaining investor files and contact with the investment community and fostering interest in recapitilizing undercapitalized thrifts. (Pay Act Rule 12(M) Statement ¶ 7).

Ms. Mirza's RTC duties comprised a large part of her work. She was required to secure receivership papers, assure the completeness of the papers, deliver papers to institutions, convince thrift management to cooperate with government seizures, return documents to OTS, and coordinate a variety of matters. (Pay Act Rule 12(M) ¶ 9). Ms. Mirza was assigned to work on a thrift only after her supervisor, Chester Bierdon, or an Assistant Director determined a thrift was insolvent or likely to become insolvent. (Pay Act Rule 12(M) Statement ¶¶ 10–11). Ms. Mirza was not involved in ascertaining which thrifts were proper candidates for her caseload and, even after a thrift was assigned to her, Ms. Mirza did not perform the day-to-day supervision and examination of the thrift. (Pay Act Rule 12(M) Statement ¶¶ 12–13). While Ms. Mirza supervised three employees she did not participate in management-level administrative discussions concerning OTS organizational matters and OTS's future. (Pay Act Rule 12(M) Statement ¶ 14).

Mr. Bierdon was responsible for planning, directing, and overseeing the examination and supervision of between 164 and 300 thrifts. (Pay Act Rule 12(M) Statement ¶ 15). He supervised between 60 and 110 employees and also performed a variety of administrative duties dealing with office procedures, the budget, and training. (Pay Act Rule 12(M) Statement ¶ 16). Alan Esterman and Robert Lindgren, Assistant Directors, were responsible for overseeing a team of approximately 25 to 30 employees and were responsible for a variety of administrative duties, including preparing the Central Region's policies and attending meetings on OTS organizational matters. (Pay Act Rule 12(M) Statement ¶¶ 17–18). Philip Gerbick

was OTS's Deputy District Director of Corporate Activities from October, 1989, to January, 1991, and its Regional Deputy Director for Technical Support beginning in January, 1991. Mr. Gerbick supervised between 20 and 39 employees. (Pay Act Rule 12(M) Statement ¶¶ 19–20).

Ms. Mirza does not respond to Treasury and OTS's overwhelming evidence that she had a unique position with substantially different duties than her supervisors and OTS's Assistant Directors. Instead, she argues she was a Group Leader in 1989 and that, at that time, her salary was comparable to other group leaders. Ms. Mirza states that by 1993 her salary had not kept pace with other Group Leaders. (Pl. Brief at 24). Ms. Mirza offers no evidence that her duties as a Group Leader were substantially similar to those of other Group Leaders. Instead, she argues that in paragraph six of its Discrimination Rule 12(M) Statement Treasury conceded all Group Leader jobs were similar. Treasury's Discrimination Rule 12(M) paragraph six says nothing of the sort and Ms. Mirza's argument to the contrary is a disservice to the Court. Ms. Mirza has presented no evidence that her duties as Industry Rehabilitation Manager were similar to any other job at Treasury. Accordingly, she fails to make out a prima facie case under the EPA for her time as Industry Rehabilitation Manager.

■ Ms. Mirza worked as an Examiner V between August, 1992, and December, 1993. (Pay Act Rule 12(M) ¶ 26). Ms. Mirza was the highest paid Examiner V during this period. (Discrimination Rule 12(M) Statement ¶ 27; Pay Act Rule 12(M) Statement ¶ 28). Ms. Mirza received a 1992 salary of $74,4604 and a 1993 salary of $75,350. (Pay Act Rule 12(M) Statement ¶¶ 25–27). Ms. Mirza argues that because of her superior education, training, and experience she should have been making even more as an Examiner V. Ms. Mirza's alleged superiority is unsupported by any record evidence.

Ms. Mirza concedes she was the highest paid Examiner V. Since she was not paid less than her male counterparts Ms. Mirza fails to meet the prima facie requirements of the EPA. *Fallon*, 882 F.2d at 1208. While her argument that she should have been making

even more money might have merit under Title VII, it does not apply in the EPA context.

■ In December, 1993, Ms. Mirza was given the position of Community Affairs Liaison at Grade 22. (Discrimination Rule 12(M) Statement ¶ 28; Pay Act Rule 12(M) Statement ¶¶ 29). As Community Affairs Liaison Ms. Mirza was responsible for promoting thrifts' awareness of the Community Reinvestment Act ("CRA"), keeping abreast of thrifts' CRA performance, and maintaining contact with community groups and state and local government officials about reinvestment issues. (Pay Act Rule 12(M) Statement ¶ 30). Ms. Mirza was the only Community Affairs Liaison in the Central Region. (Pay Act Rule 12(M) Statement ¶ 31). Ms. Mirza's salary increased to $76,480 in 1994, $78,392 in 1995, and $80,744 in 1996. (Discrimination Rule 12(M) Statement ¶ 29).

Treasury's and OTS's evidence indicates Ms. Mirza's Community Affairs Liaison duties were substantially different than any other employee's at Treasury. Ms. Mirza has responded to Treasury and OTS's evidence by arguing that job titles do not necessarily indicate one employee's duties are different than another employee's duties. This is undoubtedly true. Ms. Mirza, however, has not countered Treasury's evidence with any evidence of her own. Since Ms. Mirza has failed to show her Community Affairs Liaison duties were substantially similar to other jobs at Treasury she fails to make out a prima facie case under the EPA.

Summary judgment is granted on behalf of Treasury and OTS on all of Ms. Mirza's EPA claims.

### Pre–FIRREA Age Discrimination

■ Treasury moves for summary judgment on Ms. Mirza's pre-FIRREA age discrimination claims. These claims arise from alleged discrimination that occurred before the FIRREA was passed while Ms. Mirza was still an employee of the Bank; that is, sometime before October 8, 1989. Treasury

argues Ms. Mirza did not exhaust her administrative remedies on these claims.[8]

As an employee of the Bank, Ms. Mirza was required to comply with the administrative exhaustion requirements applicable to private employees. 12 U.S.C. § 1422b(a)(2); *Andrews v. Federal Home Loan Bank of Atlanta*, 998 F.2d 214 (4th Cir.1993). An ADEA claimant in Illinois must file a charge with the EEOC within 300 days after the alleged discriminatory action. 29 U.S.C. § 626(d)(2); *Hamilton v. Komatsu Dresser Indus., Inc.*, 964 F.2d 600, 603 (7th Cir.1992) (citations omitted). An ADEA plaintiff may not bring a suit in federal court until sixty days after the charge has been filed with the EEOC. 29 U.S.C. § 626(d). Neither Ms. Mirza nor any of her lawyers ever filed a charge or notice to sue with the EEOC or any lawsuit before the instant suit was commenced. (Pre–FIRREA Rule 12(M) Statement ¶ 27).

The only way for Ms. Mirza to avoid the ADEA's statute of limitations is by equitable tolling. Ms. Mirza has argued in the past and appears to argue in her response that she was unaware of the age discrimination in this case until she filed her Merit Systems Protection Board ("MPSB") complaint of discrimination in connection with the RIF. In essence, Ms. Mirza is relying on the "continuing violation" theory to extend the statute of limitations.

Under the "continuing violation" doctrine, a plaintiff may "get relief for a time-barred act by linking it with an act that is within the limitations period." *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 445 (7th Cir.1994). The theory behind the doctrine is that "the discriminatory nature of an act may only become apparent in light of subsequent acts if an employer follows a covert practice of discrimination." *Hill v. Runyon*, 959 F.Supp. 488, 492 (N.D.Ill.1997) (citation omitted); *see also Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1167 (7th Cir.1996) ("The principle that we extract from [the "continuing violation" doctrine] is that the plaintiff may not base [a] suit on

---

8. I granted summary judgment on behalf of the Bank on Ms. Mirza's Pre–FIRREA discrimination claims on February 9, 1995. *Mirza*, 875 F.Supp. at 517–19. Treasury's motion to dismiss these claims was denied in the same opinion.

conduct that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on that conduct, as in a case in which the conduct could constitute, or be recognized, as actionable [discrimination] only in light of events that occurred later, within the period of the statute of limitations.").

The "continuing violation" doctrine is not available if the plaintiff "knows or with the exercise of reasonable diligence would have known after each act that it was discriminatory and had harmed [her]." *Moskowitz v. Trustees of Purdue Univ.*, 5 F.3d 279, 282 (7th Cir.1993). This limitation on the doctrine is necessary so the plaintiff does "not sit back and accumulate all the discriminatory acts and sue on all within the statutory period applicable to the last one." *Id.* Since Ms. Mirza seeks the benefit of an exception to the statute of limitations she bears the burden of proof on the issue. *Knox v. Cook County Sheriff's Police Dep't*, 866 F.2d 905, 907 (7th Cir.1988).

Ms. Mirza complains she was discriminated against based on age because: (1) she received inaccurate performance evaluations and inappropriate salary increases; (2) she was not allowed to perform all the duties of her job and she could not get the cooperation of younger employees; and (3) she was not promoted to the position of Applications Department Head in 1988. (Pre–FIRREA Discrimination ¶ 19). As early as 1986 Ms. Mirza suspected that she was the victim of age discrimination. (Pre–FIRREA Rule 12(M) Statement ¶ 10). Based on discussions she had with others while working at the Bank, Ms. Mirza suspected she was undercompensated and that younger employees were receiving "extraordinary salary increases" and superior performance ratings. (Pre–FIRREA Rule 12(M) Statement ¶¶ 6–9). Additionally, after becoming the head of mergers and acquisitions, Ms. Mirza felt some of her job duties were assigned to younger employees and that the younger employees refused to cooperate with her when she tried to perform certain duties. (Pre–FIRREA Rule 12(M) Statement ¶ 11).

In 1987 Ms. Mirza began to complain to her superiors about the younger employees' lack of cooperation. (Pre–FIRREA Rule 12(M) Statement ¶ 12). In particular, Ms. Mirza complained to her supervisor, Chester Biedron, that younger employees were performing her job function and refusing to cooperate with her. (Pre–FIRREA Rule 12(M) Statement ¶ 13). In 1988 Ms. Mirza became interested in the vacant position of Applications Department Head at the bank. (Pre–FIRREA Rule 12(M) Statement ¶ 14). The position was filled by Philip Gerbick, an individual Ms. Mirza knew to be younger than her. (Pre–FIRREA Rule 12(M) Statement ¶ 16).

As early as 1981 Ms. Mirza met with an attorney to discuss the possibility of illegal employment discrimination against her. (Pre–FIRREA Rule 12(M) Statement ¶ 21). Before drafting her November, 1989 memorandum alleging sex discrimination Ms. Mirza met with an employment attorney. (Pre–FIRREA Rule 12(M) Statement ¶ 20). Ms. Mirza is a licensed attorney in Illinois and has been since 1984. (Pre–FIRREA Rule 12(M) Statement ¶ 24). Indeed, in her November, 1989 memorandum Ms. Mirza threatened to file a complaint with the EEOC, indicating she was knowledgeable about her legal rights.

The evidence indicates that Ms. Mirza either knew or should have known of any Pre–FIRREA age discrimination years before she filed suit or appealed her RIF to the MSPB. In response Ms. Mirza argues that in the past I have found there is a factual dispute as to whether she knew of Pre–FIRREA age discrimination and thus, Treasury's motion must be denied. Ms. Mirza is wrong. Although the issue is necessarily a factual one, I denied Treasury's motion to dismiss these claims because at that stage, based entirely on the face of the complaint, Ms. Mirza alleged facts that might have entitled her to equitable tolling. *Mirza*, 875 F.Supp. at 519. When Treasury later moved for summary judgment based upon the complaint and one of Ms. Mirza's depositions,[9] I denied sum-

9. Ms. Mirza's deposition has been taken on at least three separate occasions in relation to the

mary judgment as premature at that stage of the litigation. (4/4/95 Minute Order).

Now, Treasury has taken Ms. Mirza's deposition again and supplemented the record with additional exhibits. This evidence indicates Ms. Mirza should have known of her age discrimination complaints before beginning employment with OTS. The only evidence Ms. Mirza provides to rebut Treasury's argument is her own affidavit. In her brief Ms. Mirza cites her affidavit to prove she was unaware of age discrimination until she consulted with her current counsel in connection with her MSPB complaint of discrimination. (Pl. Brief at 29; Pl.Ex. AAA). Ms. Mirza's affidavit, however, does not contain any statement indicating she was unaware of age discrimination before filing her MSPB complaint. Furthermore, a plaintiff's allegation that she was unaware of discrimination, without more, is insufficient to carry the burden of proof on a continuing violation argument. If it were, every continuing violation argument would be successful.

Ms. Mirza has not shown she is entitled to equitable tolling of her pre-FIRREA ADEA claims. Accordingly, Treasury is entitled to summary judgment on those claims.

### Conclusion

For the forgoing reasons Treasury's motion for summary judgment on Ms. Mirza's Title VII, ADEA, and EPA claims is granted. OTS's motion for summary judgment on Ms. Mirza's EPA claim is also granted.